DAYTON BAR ASSOCIATION *v.* CORBIN.

[Cite as *Dayton Bar Assn. v. Corbin,*
109 Ohio St.3d 241, 2006-Ohio-2289.]

(No. 2005–2022—Submitted January 11, 2006—Decided May 24, 2006.)

**Per Curiam.**

{¶ 1} Respondent, Gregory J. Corbin of Dayton, Ohio, Attorney Registration No. 0030426, was admitted to the practice of law in Ohio in 1985.

{¶ 2} On October 11, 2004, relator, Dayton Bar Association, charged respondent with professional misconduct. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and considered the parties' comprehensive stipulations. The panel made findings of misconduct, which the board adopted, and a recommendation, which the board did not adopt.

### Misconduct

{¶ 3} The allegations of misconduct arose from respondent's agreeing to buy two real estate properties from a client.

{¶ 4} In December 2000 and January 2001, at a time when an attorney-client relationship existed between them, respondent's client offered to sell him two residential properties. She told him that she desperately needed money and that her credit record prevented her from mortgaging the properties herself. Respondent accepted her explanation and agreed to purchase the two properties for $17,500.

{¶ 5} On January 5, 2001, the client executed quitclaim deeds, transferring to respondent her interest in a home on South Ardmore Avenue and in a home on Huron Avenue, both in Dayton. At the time, respondent did not know that his client had been hospitalized for psychiatric treatment from December 27, 2000, until January 2, 2001, just before she entered this transaction. The client was hospitalized again, also without respondent's knowledge, from January 18, 2001, until January 29, 2001.

{¶ 6} Respondent and his client agreed that respondent would mortgage the properties and pay his client with the proceeds of the loans. They did not commit their purchase agreement to writing, however, and respondent began to

have second thoughts about the deal because he discovered some problems with the properties and he had lost contact with his client. In March 2001, respondent learned that the client had recently been arrested and was incarcerated in Louisiana, facing charges of armed robbery, obstruction of official business, and felonious assault. She was also still in financial distress.

{¶ 7} Respondent ultimately decided to go through with the deal to help his client, who needed money to pay for legal representation in Louisiana and for other expenses. The properties were single-family residences located in distressed neighborhoods and in need of substantial repair. Respondent did not have either property appraised, but he did research the selling prices of real estate in the neighborhood of the Huron property, which ranged from $5,000 to $35,000. Respondent was unable to mortgage the Ardmore property because his client had secured a loan on that property before he had recorded his deed, and the property was sold for $6,000 in foreclosure to satisfy that lien.

{¶ 8} In May 2001, respondent obtained a $34,000 mortgage loan on the Huron property; however, he did not immediately pay his client, who was still incarcerated in Louisiana, any proceeds of this loan or deposit the money in his trust account. He instead deposited the funds in a personal checking account belonging to the "Corbin Family Companies."

{¶ 9} Respondent testified that he had kept receipts in his client's case file for all of the money that he disbursed to her but when his client later asked for her file, respondent's secretary gave it to the client without first making a copy. Unable to obtain the case file from his client, respondent was able to only partially reconstruct the payments he had made at his client's request through bank copies of cashier's checks and Western Union records of fund transfers. According to respondent, he paid his client or others at her direction an estimated $34,000, approximately all the money that he received from the May mortgage loan. In August 2002, respondent refinanced the property for an additional $9,000.

{¶ 10} The parties stipulated and the panel and board found that respondent violated DR 5-104(A) (prohibiting a lawyer from entering into a business transaction with his client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment for the protection of the client, unless the client has consented after full disclosure) and 9-102(A) (requiring that a lawyer preserve client's funds in a separate, identifiable bank account).

## Recommended Sanction

{¶ 11} In recommending a sanction for his misconduct, the panel considered respondent's background and weighed the mitigating and aggravating factors listed in Section 10 of the Rules and Regulations Governing Procedure on

Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.").

{¶ 12} Prior to the events underlying his misconduct, respondent had a long and successful career in public employment. After graduating from law school, he worked in the child-support-enforcement division of the Montgomery County Prosecutor's office until 1989. He served as a magistrate in the Montgomery County Domestic Relations Court from 1989 through 1991. He then returned to the prosecutor's office, where he served as a senior attorney for the child-support-enforcement division until 1993. During that time, the division improved its poor performance record and became one of the best in Ohio. In 1993, he was asked to join the Montgomery County Public Defender's Office, managing a newly formed juvenile unit. He took a medical leave from the office from 1997 through 1999 as a result of a year-long hospitalization for a debilitating disease, but was then able to return to the public defender's office. Respondent continues to suffer from serious health problems, however, and he has been on a medical leave since 2003 because of physical ailments and depression.

{¶ 13} During his career, respondent has also practiced law privately when the professional and ethical demands of his public employment permitted. As a sole practitioner, respondent served an impoverished neighborhood in Dayton, where he would see clients weekday evenings and on weekends. A tremendous need for legal assistance exists in that area, along with a dearth of lawyers.

{¶ 14} As mitigating factors, the panel found that respondent had no prior record of disciplinary sanctions and had cooperated completely in the disciplinary proceedings. BCGD Proc.Reg. 10(B)(2)(a) and (d). The panel also found respondent to be "painfully honest" when asked whether he had acted in his own interest by agreeing to purchase his client's property. See BCGD Proc.Reg. 10(B)(2)(b). Respondent explained:

{¶ 15} "I would say initially when we were first dealing, probably yes. But before a loan was taken and after I had at that point decided to return the property to her, absolutely none. But then that was before she was incarcerated. When she became incarcerated, everything changed * * * [b]ecause [then] she was desperately, desperately begging, pleading, I need this, I need the money. Otherwise I can't get the representation I need. The other thing I think happened here is I think I was tired. I know this sounds stupid, but I was working all of these hours at the public defender's office, and then I'm doing this other job and I think I was tired.

{¶ 16} "And I think no matter how much you work, you should always be mindful of the Code of Ethics, be mindful of the best interests of your client. And I think at some point my judgment—I made a very, very bad decision."

{¶ 17} The panel also found mitigating respondent's explanation for why he had chosen to enter into this transaction with this needy client when he had never done so with any other. Respondent explained that the client, an older woman with whom he had become acquainted through his children's athletic activities, had often implored him for help, in tears. He said he had been unable to resist her entreaties, and he accepted responsibility for his failings.

{¶ 18} Respondent testified with fervent sincerity that he would "forever be ashamed" of his actions. He acknowledged that he had "tarnished [his] name" and that in doing so he had seriously jeopardized his ability to represent the disadvantaged people he most wanted to help.

{¶ 19} Also in mitigation, the panel considered affidavits from a Montgomery County juvenile court judge and a Dayton municipal court judge, both of whom had known respondent since 1985. See BCGD Proc.Reg. 10(B)(2)(e). The juvenile court judge described respondent as an honest, ethical, hardworking, loyal, and dedicated advocate for his clients. The municipal court judge extolled respondent's abilities, noting that he had been solicited by public officials to fill various positions and had done so with great success. The judge also commended respondent's considerable contribution in the service of children.

{¶ 20} As the single aggravating factor, the panel found that respondent's misconduct had involved a particularly vulnerable client—an incarcerated, financially distressed person with psychological difficulties. BCGD Proc.Reg. 10(B)(1)(h).

{¶ 21} The parties stipulated that they believed that the appropriate sanction for respondent's misconduct is a six-month suspension from the practice of law. The panel recommended a six-month suspension, all stayed based on the strength of respondent's mitigating evidence and the scarcity of aggravating factors. The panel also cited *Cincinnati Bar Assn. v. Hovey* (1997), 78 Ohio St.3d 495, 678 N.E.2d 1369, and *Disciplinary Counsel v. Baldwin* (1996), 74 Ohio St.3d 592, 660 N.E.2d 1145, in which lawyers received a suspended six-month suspension and a public reprimand, respectively, for similar misconduct. The panel explained:

{¶ 22} "[T]he facts of this matter are * * * analogous to *Hovey* and *Baldwin*. There was no evidence of deceit or misrepresentation by Respondent. There was no evidence that the client * * * suffered any resulting harm. An actual suspension from the practice of law for Respondent would not serve to protect the public. Respondent's demeanor and sincerity at final hearing convinced this panel that this error was out of character for Respondent who appears to be a deeply religious person. The panel is convinced it is highly unlikely that he will ever make such an error again. It is probable that Respondent's innate desire to help [his client] was the principal reason for his misguided decision to get involved in these real estate transactions. Respondent's practice, both with the

Montgomery County Public Defender's Office and in his private practice provides critically needed legal services to an underserved population in Dayton."

{¶ 23} The board adopted the panel's findings of misconduct. But finding respondent's motivation for engaging in the misconduct—helping his client—especially compelling, the board recommended that respondent be publicly reprimanded for his misconduct. The parties do not object to this disposition.

### Review

{¶ 24} We adopt the board's findings of misconduct. Based on the panel's and board's reasoning, we also agree that a public reprimand is appropriate. Respondent is therefore publicly reprimanded for his violations of DR 5–104(A) and 9–102(A).

{¶ 25} Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

---

Douple, Beyoglides, Leve, Hansen, Claypool, Kovich & Lipowicz and Richard A.F. Lipowicz; and John M. Ruffolo, Bar Counsel, for relator.

Leppla Associates and Gary J. Leppla, for respondent.