[Cite as *Cruz v. English Nanny & Governess School Inc.*, 2017-Ohio-4176.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 103714**

---

## CHRISTINA CRUZ, ET AL.

PLAINTIFFS-APPELLEES
CROSS-APPELLANTS

vs.

## ENGLISH NANNY & GOVERNESS SCHOOL INC., ET AL.

DEFENDANTS-APPELLANTS
CROSS-APPELLEES

---

**JUDGMENT:**
AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-11-768767

**BEFORE:** Keough, A.J., Blackmon, J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:** June 8, 2017

**ATTORNEYS FOR APPELLANTS/CROSS-APPELLEES**

John F. Hill
Melinda Smith Yeargin
Buckingham, Doolittle & Burroughs
3800 Embassy Parkway, Suite 300
Akron, Ohio 44333

William D. Edwards
Paul R. Harris
Alyson Terrell
Ulmer & Berne, L.L.P.
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113

Corey Noel Thrush
127 Public Square, Suite 4100
Key Tower
Cleveland, Ohio 44114


**ATTORNEYS FOR APPELLEES/CROSS-APPELLANTS**

Peter G. Pattakos
Subodh Chandra
Sandhya Gupta
Patrick Haney
Chandra Law Firm, L.L.C.
1265 West 6th Street, Suite 400
Cleveland, Ohio 44113

(Continued)

**ALSO LISTED:**
**AMICI CURIAE**

**ATTORNEYS FOR THE OHIO ASSOCIATION OF BROADCASTERS, THE OHIO NEWSPAPERS ASSOCIATION, THE OHIO COALITION FOR OPEN GOVERNMENT, PROGRESSOHIO EDUCATION, INC., THE ASSOCIATION OF ALTERNATIVE NEWS MEDIA, THE OHIO CHAPTER OF THE NATIONAL LAWYERS GUILD, CAIR-OHIO, AND NINE MEMBERS OF THE OHIO BAR**

Raymond Vasvari
K. Ann Zimmerman
1100 Erieview Tower
1301 East Ninth Street
Cleveland, Ohio 44114

**ATTORNEYS FOR AMERICAN CIVIL LIBERTIES UNION OF OHIO FOUNDATION**

Jonathan Peters
Freda J. Levenson
4506 Chester Avenue
Cleveland, Ohio 44103-0000

**ATTORNEYS FOR FIRST AMENDMENT LAWYERS ASSOCIATION**

J. Michael Murray
Steven D. Shafron
Bergman, Gordon, Murray & DeVan
55 Public Square, Suite 2200
Cleveland, Ohio 44113-0000

KATHLEEN ANN KEOUGH, A.J.:

{¶1} Defendants-appellants/cross-appellees, English Nanny & Governess School ("the School"), English Nannies, Inc., d.b.a. English Nannies & Governess, Inc., ("the Placement Agency"), Sheilagh Roth ("Roth"), and Bradford Gaylord ("Gaylord") (collectively "defendants" or "English Nanny"), appeal the trial court's decision denying their motion for directed verdict and judgment notwithstanding the verdict on plaintiff-appellee/cross-appellant, Christina Cruz's ("Cruz"), claim for intentional infliction of emotional distress, and plaintiff-appellee/cross-appellant, Heidi Kaiser's ("Kaiser"), claim for wrongful discharge.

{¶2} Cruz appeals the trial court's decision granting defendants' motion for remittitur on her claim for intentional infliction of emotional distress. Cruz and Kaiser collectively appeal the trial court's decision reducing their attorney fee award. Finally, cross-appellant, attorney Peter Pattakos, appeals the trial court's decision imposing sanctions against him.

{¶3} For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. Procedural History

{¶4} The case arises from the relationship between Cruz and the defendants, and the demise of that relationship upon Cruz's decision to report an allegation of child abuse. Cruz believed that the defendants were not supportive of her decision to report the

alleged abuse, and the defendants believed that Cruz's allegations were not well-founded. Cruz believed that she was blackballed from being placed as a nanny after she decided to report the abuse, and Kaiser believed she was wrongfully terminated from English Nanny for not participating in the alleged cover-up of the child abuse report and for disclosing information to Cruz regarding the defendants' skepticism about Cruz's allegations.

{¶5} In November 2011, Cruz and Kaiser (collectively "the plaintiffs") filed a complaint against the English Nanny defendants, Bradford Holdings, and C.F.H. Ltd. In the complaint, Cruz brought causes of action for wrongful termination against public policy, defamation, negligent and intentional infliction of emotional distress, and breach of contract. Kaiser raised causes of action for wrongful termination against public policy and defamation. Defendants denied these claims and asserted a breach of contract counterclaim against Cruz.

{¶6} In March 2012, the trial court granted, in part, English Nanny's motion for partial judgment on the pleadings by dismissing the case against Bradford Holdings and C.F.H. Ltd. The court also dismissed Cruz's claims for wrongful termination in violation of public policy and negligent infliction of emotional distress.

{¶7} In October 2013, the trial court granted summary judgment in favor of Gaylord on Cruz's claims for defamation, intentional infliction of emotional distress, and breach of contract, and on Kaiser's claims of wrongful termination in violation of public policy and defamation. The trial court also granted summary judgment in favor of Roth on Cruz's claims for breach of contract, defamation, and intentional infliction of

emotional distress, and on Kaiser's claim for wrongful termination. The trial court granted summary judgment in favor of the School and the Placement Agency on Cruz's claims for defamation, breach of contract based on breach of the retail installment contract, and intentional infliction of emotional distress.

{¶8} In January 2014, Cruz moved for reconsideration of the trial court's decision granting summary judgment on her claim for intentional infliction of emotional distress. The request for reconsideration was based on the production of placement files that English Nanny produced after the trial court granted Cruz's motion to compel discovery. The trial court found that Cruz's introduction of this newly produced discoverable evidence was sufficient to withstand summary judgment on Cruz's intentional infliction of emotional distress claim.

{¶9} Accordingly, the causes of action left for trial were: Cruz's claims against the remaining English Nanny defendants for intentional infliction of emotional distress, and her claim against the School and Placement Agency for breach of contract based on the exclusive placement agreement; and Kaiser's claim for wrongful termination in violation of public policy against the School and the Placement Agency, and her claims for defamation against the School, the Placement Agency, and Roth.[1] Additionally, English Nanny's counterclaim against Cruz for breach of contract remained.

---

[1] Kaiser's defamation cause of action was dismissed with prejudice prior to the start of the first trial on April 2, 2015.

{¶10} On March 31, 2015, jury selection began for trial. At the end of voir dire, counsel for English Nanny commented that an article about the case had been published by Scene Magazine and was accessible on the internet. Before opening statements on April 2, 2015, discussion occurred about the article in Scene Magazine. The periodical containing the article was available on the internet and print copies were available free of charge in the courthouse and in a location where potential jurors could obtain a copy and view the article. The trial court questioned the parties about the source of the article, and attorney Pattakos explained that he had provided Scene Magazine with publicly available information about the case. The article contained only the plaintiffs' perspective about the matter and revealed unfavorable information about the defendants' case. Additionally, the online article had generated comments from the public that were unfavorable to the defendants.

{¶11} The trial court conducted an oral hearing on whether the availability of the article in the periodical had tainted the jurors in the case. The court concluded that attorney Pattakos's conduct was problematic, but found after questioning the jury, that the jury was not tainted so as to warrant a mistrial. However, the judge declared a mistrial days later for reasons unrelated to the Scene Magazine article, and the jurors were excused.

## II. Jury Trial

{¶12} On May 19, 2015, a second jury was impaneled and the following relevant facts were presented; additional facts will be discussed as they pertain to each assignment of error.

{¶13} English Nanny & Governess School, Inc. is a prestigious trade school that has been training professional nannies and governesses since 1985. Roth is the executive director of the school, and Gaylord is the director of operations of the Placement Agency that works to help match families with nannies from among the School's qualified graduates. Kaiser worked briefly as a placement director at the Placement Agency in early 2011, while Cruz was a student at the School.

{¶14} In the spring of 2011, Cruz enrolled as a student at the School. When she enrolled, she paid $2,000 and signed a Retail Installment Contract with the School to borrow $7,100, the balance of the original $9,100 cost of tuition and fees. Pursuant to the contract, Cruz agreed to repay the loan beginning in August 2011.

## A. Cruz's Claim

{¶15} After Cruz's graduation in June 2011, Kaiser, as the placement director, arranged for Cruz to spend a weekend with a single father and his two daughters in Pennsylvania interviewing for a nanny position. Cruz testified that during this trip, she felt uncomfortable and certain events, actions, and interactions caused her alarm. Specifically, she stated that during the final evening she was with the family, she witnessed an inappropriate sexual act between the father and the oldest daughter. Cruz testified that she was shocked and nervous and did not know what she should do

considering she was alone in the house with the family. She decided she would seek guidance from English Nanny on how to proceed with reporting the abuse.

{¶16} On July 9, 2011, after returning to Ohio, she told Kaiser what she had seen between the father and his daughter. On July 14, Cruz told Barbara Francis, director of operations for the Placement Agency, about the incident and that she was "getting the feeling that [Gaylord was] not happy about [what happened], that it's going to affect [her] placement." (Tr. 793.) Cruz disclosed to Francis that Kaiser told her that Gaylord was "annoyed" and that if she reported, it would "cause a big mess." (Tr. 794.)

{¶17} According to Cruz, Francis told her that whether she decided to report the abuse was up to Cruz, and that English Nanny was not getting involved. Additionally, Francis told Cruz that she was not a mandated reporter of child abuse and therefore, it was not her responsibility to report. (Tr. 792.) Based on this conversation, Cruz felt discouraged and was afraid her placement would be affected if she reported the abuse. Francis told Cruz to speak with Angel Chapin, the instructor of the class on child abuse at the School.

{¶18} Cruz testified that she spoke with Chapin and told her in detail about the events and what she witnessed. She testified her purpose was to see if there was enough or sufficient reasoning to report the abuse. According to Cruz, Chapin seemed like she did not believe her and kept questioning each detail. Despite Cruz telling Chapin that the entire weekend dynamic and the incident warranted a report, Chapin told her that she did not think it was child abuse and that she needed proof. Nevertheless, Chapin told Cruz

that it was ultimately up to Cruz to report the incident, but that in her opinion it was not child abuse and not to report it because it could ruin families. (Tr. 801-806.)

{¶19} As a result of this conversation, Cruz attempted to contact both Roth and Gaylord about the incident. Neither were available to talk to her, but Kaiser indicated to Cruz that they were upset and did not take the allegation seriously. (Tr. 806.)

{¶20} Cruz testified that when she finally spoke with Gaylord about the incident, she felt he was not supportive because he told her to "forget about it," and "don't get involved," "the father could sue the school," "it could be a mess." (Tr. 808.) According to Cruz, she felt Gaylord kept changing the topic to her placement as a nanny to deter her from reporting the abuse.

{¶21} Cruz learned of Kaiser's termination after speaking with Gaylord. According to Cruz, she felt that Kaiser was terminated because of her, which caused her to get scared, nervous, and sick because she felt that she was being blackballed. Accordingly, Cruz told Gaylord that she could not keep the incident a secret and that she was going to report the abuse. Cruz testified that this prompted Gaylord to agree that she should talk with Roth about the incident.

{¶22} Cruz stated that when she spoke with Roth, Roth was irritated and annoyed that Cruz was causing a problem. When Cruz told Roth that she was reporting the abuse, Roth told her "no you're not." (Tr. 819.) After explaining her position and that she needed help writing the report, Roth referred Cruz to Shari Nacson, a social worker whom the School had recently hired to teach a class on recognizing and reporting child abuse.

**{¶23}** Cruz testified that Nacson was supportive of her decision to report and based on what Cruz told her, Nacson indicated that the report needed to be made immediately. The two of the them worked together to create a thorough and detailed report. Although she met with Nacson in early August, Cruz did not file her formal report of child abuse until August 11, 2011.

**{¶24}** Cruz admitted that at the same time she was reporting the allegation of abuse, her loan with the School was due. She stated this caused her more anxiety and to have panic attacks because she was getting the feeling that her report was affecting her placement as a nanny. According to Cruz, she received permission from Gaylord to seek nanny placements outside the Placement Agency and the Exclusive Placement Agreement.

**{¶25}** Cruz testified that after Roth and Gaylord knew she was making the formal report, things changed between her and the Placement Agency. Cruz stated that there was little communication, interviews were cancelled, and she received a request for a medication list and to sign a release to obtain medical information. She was subsequently told that she could not be placed with a family because documentation was missing from her file. On August 19, 2011, a week after the formal report was made, Cruz received a letter from Roth releasing Cruz from the Exclusive Placement Agreement.

### B. Kaiser's Termination

{¶26} Kaiser testified that on July 11th, she told Gaylord what Cruz had witnessed. According to Kaiser, Gaylord "became extremely agitated, very upset." (Tr. 1851.) She testified that Gaylord stated that Cruz "doesn't know what she saw; she's crazy; [the father is] going to sue us. Tell her not to report. No more interviews for Christina." (Tr. 1851.) Kaiser stated that moments later, Roth came into the office and Gaylord ordered Kaiser to "get [Roth] in here." (Tr. 1853.) Kaiser went into Roth's office and briefly told her what had occurred with Cruz. According to Kaiser, Roth responded similarly to Gaylord by stating that "she didn't know what she saw and this kind of thing ruins families. 'Tell her not to report.'" (Tr. 1853.) Both Roth and Gaylord denied that Kaiser ever told them about Cruz's allegation. However, Cheryl McNulty, who worked in the Placement Agency from June to September 2011, testified that Gaylord was upset that day, and although she did not know why, she knew it involved Cruz and Kaiser. (Tr. 1668.)

{¶27} Kaiser told the jury that Gaylord did not want Cruz to receive any more interviews if she reported the alleged abuse and told her to dissuade Cruz from reporting. (Tr. 1855.) Kaiser interpreted this conduct as "[h]e wanted me to blackball her." (Tr. 1855.) Nevertheless, Kaiser continued to encourage Cruz to report the allegations, but told her she would be met with opposition from Roth and Gaylord if she reported.

{¶28} Kaiser testified that she told Cruz how Gaylord had reacted and what was being said. Kaiser stated that despite being ordered to not send Cruz on any more interviews, Kaiser continued submitting Cruz's information to potential families.

Additionally, Kaiser stated that based on the allegation, she did not want to send the Pennsylvania father any additional nanny candidates, so she only referred individuals who she knew would be unacceptable to him. Ultimately, the father asked for a refund due to the lack of service. (Tr. 1860.)

**{¶29}** Kaiser testified that prior to the incident with Cruz, she had no problems with her job and had not received any complaints about her job performance. In fact, three weeks prior to her termination, Roth wrote letters to two separate individuals praising Kaiser as a "great asset" and "wonderful asset" to English Nanny, noting in one of the letters that, "we love having Heidi here." (Tr. 458-459.)

**{¶30}** On July 12, Kaiser received an email from Barbara Francis advising her about the workbook she wanted Kaiser to use. The email asked Kaiser to meet with her to go over the training on how to use it. Kaiser admitted that this was not the first time the use of the workbook was discussed, but that it was the first time she saw the workbook template. Based on her experience with spreadsheet-type documents, Kaiser believed the workbook could be improved upon; however, after meeting with Francis, she concluded it was best to do it the way Francis wanted.

**{¶31}** The following day, Kaiser received another email from Francis reminding her about their July 6 conversation that Gaylord wanted a list of current clients and all student graduates seeking positions. It was apparent from the email, that both Gaylord and Francis were unhappy that Kaiser had not compiled the list. Kaiser responded to the email, explaining that other agency tasks, including tasks for Gaylord that were not part

of her job description, had taken her away from this task, but that she would make it a priority to compile the information. Instead, on July 18, Francis handed her a termination letter, explaining that Kaiser was being fired for no improvement in her job performance.

{¶32} Lynn Behrman, Kaiser's successor, testified that she does not use any workbook spreadsheet to track the work done matching clients with student graduates and that no one has ever asked her to create such a document. (Tr. 2111-2112.)

### C. The Defense

{¶33} Roth denied that she ever tried to discourage Cruz from reporting the suspected abuse, and in fact, that she believed Cruz had a duty to report the abuse and even provided Cruz with the father's address in Pennsylvania. Roth testified repeatedly that neither she, Gaylord, nor any other employee had an obligation to report the abuse, but that only Cruz had a duty to report the abuse. Roth stated that she could not understand why, despite this duty, Cruz did not report the abuse until August 11, 2011, which coincidentally was after Cruz defaulted on her School loan. She testified that she was not made aware of Cruz's allegations until she personally spoke with her on July 26, 2011. At that time, she referred Cruz with Nacson due to her expertise in the field. She testified that she assumed Nacson would help Cruz with her report; however, she was quite surprised that the formal report, which she characterized as "embellished," was not filed until over a month after the incident occurred.

**{¶34}** Roth testified that she became concerned about Cruz based on Cruz's conduct and erratic behavior after the abuse allegation, specifically, the constant phone calls and lengthy emails that Roth classified as "gobbledygook." She stated that this caused her serious concern about "what was going on with her." Based on this behavior, Roth reviewed Cruz's application file from 2008. In it, Roth found information regarding psychiatric symptoms and the name of Cruz's treating physician. Roth testified that in light of this information, and despite Cruz's subsequent 2011 application where she indicated that she had no past or present emotional conditions, Roth felt compelled to further inquire into Cruz's psychiatric history. Additionally, when Roth reviewed Cruz's 2011 application again, she realized that Cruz's file was incomplete. Roth testified that after contacting Cruz's former physician, Dr. Anna Burkey, she determined that she could no longer recommend Cruz for placement due to Cruz's ongoing mental health needs. Accordingly, on August 19, 2011, Roth wrote Cruz a letter releasing her from any obligation to the Placement Agency under the Exclusive Placement Agreement, focusing on the downturn of the economy and not Roth's concerns about Cruz's psychiatric conditions.

**{¶35}** Bradford Gaylord also testified that he never dissuaded Cruz from reporting the abuse. He also denied that Kaiser spoke to him about Cruz's allegations on July 11, stating that the first time he heard about the allegations was when Cruz called him in the late evening of July 25. Gaylord said he did not understand why Cruz waited two weeks to tell him about the alleged abuse, and that if she had told him immediately, he would

have definitely supported her. Gaylord testified that after he spoke with Cruz on July 25 about the alleged abuse, he went to work the following day and told Roth that "Christina has an issue, you need to deal with it." (Tr. 2650.) According to Gaylord, that was "all his responsibility was" because Roth was the appropriate authority to address the issue. (Tr. *id.*).

{¶36} When asked about Cruz's performance at the school, Gaylord told the jury that Cruz was a "great con artist" who "didn't learn much" attending the School, despite achieving high marks in all of her classes. (Tr. 2597.) Additionally, he denied telling Cruz that she could seek out nanny positions on her own because she was still under the Exclusive Placement Agreement.

{¶37} Additionally, Gaylord denied that he excluded Cruz from any interviews or potential placements after the allegation of abuse surfaced. Despite Kaiser testifying that Gaylord told her not to give Cruz any more interviews, Lynn Behrman, Kaiser's replacement, testified that she attempted to place Cruz as a nanny with families between July and August 2011. She stated that she was never advised not to place to Cruz with a family or to stop all interviews for Cruz until it was discovered that Cruz's file was incomplete. Additionally, Behrman stated that at no time was she reprimanded for attempting to place Cruz with a family.

{¶38} In their defense to Cruz's tort claims for emotional distress, the defendants focused on Cruz's history of emotional and psychological distress. The jury was presented with Cruz's medical history and her own testimony that she has suffered her

entire life with emotional problems, including anxiety and depression. Cruz admitted that the episodes of panic attacks, depression, and anxiety continued in her adult life, which she attributed to financial strain. She testified extensively about her financial difficulties and bouts of unemployment prior to attending the School, but said that despite these prior issues and the subsequent emotional distress caused by English Nanny, she was able to attend school, obtain high grades, and obtain and perform nanny-type employment.

## D. The Verdict

{¶39} After a 26-day, bifurcated-jury trial, the jury found in favor of Cruz and against all defendants on her claim for intentional infliction of emotional distress. The jury award Cruz $150,000 ($75,000 in economic damages and $75,000 in non-economic damages) against each defendant. Additionally, the jury awarded Cruz punitive damages against (1) the Placement Agency in the amount of $50,000, (2) Sheilagh Roth in the amount of $68,750, and (3) Bradford Gaylord in the amount of $50,000. The jury also found these defendants liable for Cruz's reasonable attorney fees. The jury found in favor of Cruz on her breach of contract claim and awarded her nominal damages of $10.

{¶40} The jury also found in favor of Kaiser and against the School on her claim of wrongful discharge in violation of public policy, awarding her $20,000 in damages. Additionally, the jury awarded her punitive damages against the School and the Agency in the amount of $54,000, plus reasonable attorney fees.

**{¶41}** The jury found in favor of the School against Cruz on the School's counterclaim for breach of contract and awarded the School $8,262.24.

### III. Post-Trial Motions

**{¶42}** Following the trial, the parties filed several post-trial motions, including motions for judgment notwithstanding the verdict ("JNOV"), new trial, remittitur, and to cap the punitive damages award.

**{¶43}** The trial court denied defendants' motions for JNOV challenging both verdicts in favor of Cruz and Kaiser; however, the trial court granted defendants' motion for remittitur, which reduced Cruz's economic damages award from $75,000 to zero. The court also applied the statutory punitive-damages caps to reduce the total damages award to $194,066.76. After a subsequent hearing on attorney fees, the trial court award the plaintiffs $125,504.45 in fees and expenses.

**{¶44}** In a separate but related matter, defendants filed a motion for sanctions against attorney Pattakos for his involvement in the creation and publication of the Scene Magazine article that was published during the first trial. The defendants sought sanctions in an amount equal to the defendants' attorney fees expended during the hearing regarding the publication, in addition to fees expended for seeking sanctions. After a hearing, the trial court issued a written opinion finding that attorney Pattakos had engaged in "frivolous conduct" in violation of R.C. 2323.51, thus warranting the imposition of sanctions. The parties stipulated that the fee award against attorney Pattakos would, if affirmed on appeal, be in the amount of $10,961.75.

**{¶45}** This appeal and cross-appeal follow.

## IV.  Appeal

**{¶46}** In their first and second assignments of error, the defendants contend that the trial court erred in denying their motions for directed verdict and JNOV on Cruz's claim for intentional infliction of emotional distress and Kaiser's claim for wrongful discharge in violation of public policy.

**{¶47}** Under Civ.R. 50(A)(4), a court may properly grant a motion for directed verdict when, after construing the evidence most strongly in favor of the party against whom the motion is directed, it finds that reasonable minds could come to but one conclusion on a determinative issue, and the conclusion is adverse to the nonmoving party.  Review of the grant or denial of a motion for directed verdict is de novo. *Kanjuka v. Metrohealth Med. Ctr.*, 151 Ohio App.3d 183, 2002-Ohio-6803, 783 N.E.2d 920, ¶ 14 (8th Dist.), citing *Grau v. Kleinschmidt*, 31 Ohio St.3d 84, 90, 509 N.E.2d 399 (1987).  In evaluating the grant or denial of a Civ.R. 50(B) motion for JNOV made after all the evidence is presented at trial, a reviewing court applies the same test as that applied in reviewing a motion for a directed verdict.  *Id.*; *Chem. Bank of New York v. Neman*, 52 Ohio St.3d 204, 206-207, 556 N.E.2d 490 (1990).  With these standards in mind, we now turn to the defendants' arguments.

### A.  Cruz's Claim for Intentional Infliction of Emotional Distress

**{¶48}** Under Ohio law, to recover on a claim for intentional infliction of emotional distress, a plaintiff must prove:

1. [T]hat the [defendant] either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;

2. [T]hat [defendant's] conduct was extreme and outrageous, that it went beyond all possible bounds of decency and that it can be considered as utterly intolerable in a civilized community;

3. [T]hat [defendant's] actions were the proximate cause of the plaintiff's psychic injury; and

4. [T]hat the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it.

*Pyle v. Pyle*, 11 Ohio App.3d 31, 463 N.E.2d 98 (8th Dist.1983), paragraph two of the syllabus; *Phung v. Waste Mgt., Inc.*, 71 Ohio St.3d 408, 410, 644 N.E.2d 286 (1994).

{¶49} When the Ohio Supreme Court first recognized the tort of intentional infliction of emotional distress, it adopted the standard set forth in the Restatement as, "'[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousement, & Helpers of Am.*, 6 Ohio St.3d 369, 374, 453 N.E.2d 666 (1983), quoting Restatement of the Law 2d, Torts 71, Section 46(1) (1965).

{¶50} "In order to state a claim alleging the intentional infliction of emotional distress, the emotional distress alleged must be serious." *Yeager* at *id.* Although the *Yeager* court did not define or explain the requirement of "serious emotional distress," the court referred to its decision in *Paugh v. Hanks*, 6 Ohio St.3d 72, 451 N.E.2d 759 (1983).

In *Paugh*, the court stated that "serious emotional distress describes emotional injury which is both severe and debilitating. Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Paugh* at paragraph 3a of the syllabus; *Banford v Aldrich Chem. Co.*, 126 Ohio St.3d 210, 2010-Ohio-2470, 932 N.E.2d 313, ¶ 29 ("serious emotional distress" means that which is "both severe and debilitating"); *Stancik v. Deutsche Natl. Bank*, 8th Dist. Cuyahoga No. 102019, 2015-Ohio-2517, ¶ 44 ("serious emotional distress" defined as "emotional injury which is both severe and debilitating"). Thus, the distress goes "beyond trifling mental disturbance, mere upset or hurt feelings." *Paugh* at 78. In fact, the *Paugh* court noted that a "non-exhaustive litany of some examples of serious emotional distress should include traumatically induced neurosis, psychosis, chronic depression, or phobia." *Id.*, citing *Molien v. Kaiser Found. Hosps.*, 27 Cal.3d 916, 933, 616 P.2d 813 (1980).

**{¶51}** The severity of a plaintiff's alleged emotional distress may be determined by the court as a matter of law. *Paugh* at 78. "The intensity and the duration of the distress are factors to be considered in determining its severity. * * * It is for the court to determine whether on the evidence severe emotional distress *can* be found; it is for the jury to determine whether, on the evidence, it has *in fact* existed." (Emphasis added.) Comment j to Restatement of the Law 2d, Torts 77, Section 46 (1965).

**{¶52}** The crux of defendants' arguments raised during its request for directed verdict, in its motion for JNOV, and now here on appeal is that insufficient evidence was

presented that Cruz's emotional distress was *both* severe *and* debilitating, specifically focusing on "debilitating." Cruz, on the other hand, contends that the word "debilitating" does not require complete and total debilitation. Therefore, this issue hinges on what constitutes "debilitating" in the realm of an intentional infliction of emotional distress claim and whether the evidence was sufficient to submit this issue to the jury.

{¶53} In *Binns v. Fredendall*, 10th Dist. Franklin No. 85AP-259, 1986 Ohio App. LEXIS 6568 (Apr. 22, 1986), the court stated that the word "debilitating" does not require that the emotional distress be of extreme gravity in order for the injured party to be entitled to recovery. *Binns* at *15. "Debilitating does not suggest one so feeble as to require a straight jacket or nursing care * * * but rather, to debilitate means only to impair the strength or to weaken." *Id*. "Debilitating" does not require that a person be permanently incapacitated, disabled, or forever unable to cope. *See Dayton Bar Assn. v. Corbin*, 109 Ohio St.3d 241, 2006-Ohio-2289, 846 N.E.2d 1249 (using the word "debilitating" to describe a disease that required a year-long hospitalization).

{¶54} The relevant case law surrounding the tort of intentional infliction of emotional distress seems to focus on whether the plaintiff sought medical or psychological treatment for the alleged emotional distress. *Plikerd v. Mongeluzzo*, 73 Ohio App.3d 115, 126, 596 N.E.2d 601 (3d Dist.1992) (evidence of serious emotional distress was insufficient where plaintiffs "neither sought or received any medical, psychiatric, or psychological treatment, missed any work or incurred any expense for

treatment of emotional distress"); *Paige v. Youngstown Bd. of Edn.*, 7th Dist. Mahoning No. 93 C.A. 212, 1994 Ohio App. LEXIS 5942 (Dec. 23, 1994) (an emotional injury will not be found to be severe and debilitating where plaintiff fails to show that he sought medical or psychological help or was unable to work or otherwise function in his daily life).

**{¶55}** The defendants direct this court to consider portions of Cruz's testimony where she indicated that she was able to cope adequately; including, Cruz's assertion that at all relevant times, she was able to function as a nanny; that at the time of trial, she was employed full-time at a daycare center; and immediately following the report of abuse, she was advertising and interviewing for nanny positions on her own. The defendants also place much emphasis on the fact that Cruz has suffered from mental health issues all her life and been under the constant care of a physician for her symptoms and conditions.

**{¶56}** However, the defendants ignore portions of Cruz's testimony where she indicated that she was unable to cope with the mental distress caused by the defendants' actions. She characterized this event as "one of the worst events that I've experienced" where she felt powerless and awful "because people she trusted treated her like garbage." (Tr. 864.) She explained that during this time, she suffered sustained depression, with constant emotional issues, panic attacks, anxiety attacks, and nightmares. (Tr. 864, 1351.) Additionally, she stated that "[t]his stress that I had to go through, basically making me have to choose between my livelihood and finishing the goals for my life, or reporting this about a little girl. It was awful." (Tr. 865.)

**{¶57}** Cruz testified that her sense of self-esteem is not the same, she has had trouble sleeping, "alternat[ing] between being unable to eat and stuffing [her] feelings, and that [appellants'] abusive conduct has affected how [she] feel[s] about [her]self and affected her relationships to the point that she feels unable to even be in a relationship." (Tr. 867; 1352.)  She stated that she "experience[s] anxiety on the job and that the depression is something that [she's] had to hide,"  and she has been able to control those symptoms so they do not interfere with work.  (Tr. 1357.)  Cruz explained how she felt about Roth's misrepresentation about her mental health:

> They made me think I was crazy. * * * I literally thought maybe I was schizophrenic. * * * Thinking irrational thoughts about myself because I thought that maybe if all these people are saying you're crazy, what's the common denominator? * * * They made me feel like I'm not even human because I'm — I was on antidepressants; * * * that I had no right to be around children * * * You shouldn't have to always go around feeling ashamed of yourself because people basically used that as an excuse for getting rid of you.

(Tr. 1354-1355.)

**{¶58}**  Dr. Monifa Seawell, Cruz's expert, opined to a reasonable degree of medical certainty that "Cruz had a preexisting major depressive disorder and panic disorder, but that she experienced a significant worsening of both of these conditions as a proximate result of [the defendants'] actions," and was left "severely impaired after and as a result of these incidents" with "ongoing symptoms of significant depression and anxiety * * * likely [to] continue."  (Tr. 1444; 1469.)  According to Dr. Seawell, Cruz was substantially unimpaired by her pre-existing anxiety and depression disorders prior to her involvement with the defendants.  However, immediately after Cruz's experiences

with the defendants, Cruz's conditions worsened. She testified that the severity of Cruz's symptoms never subsided and that her depression symptoms were so severe that they impacted her academic performance, and that "her feelings of depression, low energy, and fatigue also made it difficult for her to concentrate on her work, causing her with withdraw from school." (Tr. 1466.)

{¶59} Conversely, the defendants' expert, Dr. Joel Steinberg testified to a reasonable degree of medical certainty that Cruz's pre-existing psychological problems do not appear to have been exacerbated or aggravated by any action taken by the defendants. However, Dr. Steinberg did testify that if the events Cruz disclosed to him and testified to at trial were in fact true, it would cause worsening of anxiety and depression symptoms.

{¶60} Finally, Dr. Fabio Urresta, Cruz's treating physician, testified about his treatment of Cruz since July 2011. He stated that since her involvement with English Nanny, Cruz's depressive symptoms have increased, and with the way her symptoms have manifested over time, there was a discrete cause or an event or series of events that were traumatic to Cruz and caused the worsening of any prior conditions she may have had. Further, because Cruz did not show any typical pattern in her life when it came to sleeping, eating, or enjoying certain aspects in her life, Dr. Urresta characterized Cruz as having a typical major depressive disorder. Finally, Dr. Urresta concurred with Dr. Seawell's expert opinion about Cruz's conditions, finding that her conclusions were consistent with his experience in treating Cruz.

**{¶61}** In this case, the evidence was sufficient to survive defendants' motion for directed verdict and subsequent motion for JNOV. Whether Cruz's mental health condition that existed prior to her involvement with English Nanny was unchanged or exacerbated by English Nanny's conduct was a question for the jury; testimony and evidence were presented supporting a finding of both. Therefore, reasonable minds could find that the evidence was sufficient to support the claim for intentional infliction of emotional distress. Whether the evidence proved that the defendants' outrageous conduct actually caused Cruz severe and debilitating emotional distress was for the jury to determine.

**{¶62}** Accordingly, viewing the evidence most strongly in favor of Cruz, we find that the trial court did not err in denying the defendants' motion for directed verdict and subsequent motion for JNOV. The defendants' first assignment of error is overruled.

### B. Kaiser's Claim for Wrongful Discharge

**{¶63}** In their second assignment of error, the defendants contend that the trial court erred in denying their motions for directed verdict and JNOV on Kaiser's claim for wrongful discharge in violation of public policy.

**{¶64}** In the absence of an employment contract, employees work on an at-will basis, which means that the employee or the employer may terminate the employment relationship for any reason that is not contrary to law. *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985), paragraph one of the syllabus. However, the Ohio Supreme Court has recognized a narrow public-policy exception to Ohio's

employment-at-will doctrine. *Greeley v. Miami Valley Maintenance Contrs., Inc.*, 49 Ohio St.3d 228, 235, 551 N.E.2d 981 (1990), *Painter v. Graley*, 70 Ohio St.3d 377, 384, 639 N.E.2d 51 (1994).

**{¶65}** The elements of the tort of wrongful discharge in violation of public policy ("*Greeley* claim") are,

> "1. That clear public policy existed and was manifested in a state or federal constitution, statute[,] or administrative regulation, or in the common law (the clarity element).
>
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).
>
> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).
>
> 4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element)."

*Painter* at 385, fn. 8, quoting Professor Henry H. Perritt, *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?*, 58 U.Cin.L.Rev. 397, 398-399 (1989); *Collins v. Rizkana*, 73 Ohio St.3d 65, 652 N.E.2d 652 (1995). *Greeley* claims survive only under limited circumstances when all four elements are satisfied. *Rebello v. Lender Processing Servs., Inc.*, 2015-Ohio-1380, 30 N.E.3d 999, ¶ 28 (8th Dist.).

**{¶66}** The clarity and the jeopardy elements are questions of law and policy to be determined by the court. *Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 151, 677

N.E.2d 308 (1997), citing *Collins* at 70. The causation and overriding-justification elements are questions of fact to be determined by the trier of fact. *Id*.

{¶67} In this case, Kaiser alleged that she suffered retaliatory termination for not participating in the cover up of a child abuse report. Specifically, she alleged at trial that she was terminated for failing to discourage Cruz from reporting the child abuse, and for resisting or undermining the defendants' efforts to discourage Cruz from reporting the child abuse.

{¶68} The defendants maintained at trial, and on appeal, that Kaiser could not and did not satisfy the "jeopardy element" of the public policy exception to the "at-will employment" doctrine. Specifically, defendants contend that Kaiser's termination cannot jeopardize public policies relating to child abuse reporting and prevention because she did not witness or report child abuse, did not owe any duty to report child abuse, and had no job responsibilities or expertise that would place her in a position to report child abuse. Additionally, the defendants contend the public policy of reporting child abuse is already adequately protected by statutes and regulatory schemes; thus, recognizing a public policy exception is not necessary to protect society's interests. According to the defendants, the proper focus is on protecting the public policy, not protecting the employee's right to a civil remedy.

{¶69} Professor Perritt explained that proving jeopardy involves proving several subordinate factual propositions:

> 1. That the plaintiff engaged in particular conduct, such as an act while off duty, a protest of an employer's policy, or a refusal of an employer's order;

2.  That the conduct proves in step 1 furthers the public policy asserted, either because the public policy directly promotes the conduct (as in the public policy in favor of jury service) or because the conduct is necessary to effective enforcement of the public policy (as in a public policy against excess consumer loan charges, which depends on vigilance by bank employees); and

3.  That threat of dismissal will discourage the conduct.

2 Perritt, *Employee Dismissal Law and Practice*, Section 7.17, at 43 (4th Ed.1998).

{¶70} In the plurality opinion of *Wiles v. Medina Auto Parts*, 96 Ohio St.3d 240, 2002-Ohio-3994, 773 N.E.2d 526, the Ohio Supreme Court discussed the jeopardy element.  "An analysis of the jeopardy element necessarily involves inquiring into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful discharge claim."  *Id*. at ¶ 15, citing 2 Perritt at 44, Section 7.17.  In *Wiles*, the employee brought a common law cause of action for wrongful discharge in violation of public policy based on an employer's violation of the Family Medical Leave Act ("FMLA").

{¶71} The *Wiles* court interpreted Professor Perritt's framework regarding the jeopardy analysis by stating that,  "'If the statute that establishes the public policy contains its own remedies, it is less likely that tort liability is necessary to prevent dismissals from interfering with realizing the statutory policy.'"  *Id.* at ¶ 15, quoting 2 Perritt at 71, Section 7.26.  "Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests."  *Id*. at ¶ 15, citing *Ross v. Stouffer Hotel Co. (Hawaii) Ltd.,*

*Inc*., 76 Haw. 454, 464, 879 P.2d 1037 (1994); *Erickson v. Marsh & McLennan Co., Inc*., 117 N.J. 539, 562, 569 A.2d 793 (1990); *Kofoid v. Woodard Hotels, Inc*., 78 Ore.App. 283, 286-287, 716 P.2d 771 (1986), citing *Walsh v. Consol. Freightways*, 278 Ore. 347, 563 P.2d 1205 (1977).

{¶72} "In that situation, the public policy expressed in the statute would not be jeopardized by the absence of a common-law wrongful-discharge action in tort because an aggrieved employee has an alternate means of vindicating his or her statutory rights and thereby discouraging an employer from engaging in the unlawful conduct."  *Wiles* at ¶ 15.  Accordingly, the court declined to recognize a common law cause of action for wrongful termination because allowing the claim is unnecessary to vindicate the policy goals of the FMLA; a statutory remedy exists within the act that protects society's interest and an employee's right against termination in violation of the FMLA.

{¶73} The Ohio Supreme Court again discussed the jeopardy element in *Leininger v. Pioneer Natl. Latex*, 115 Ohio St.3d 311, 2007-Ohio-4921, 875 N.E.2d 36.  In *Leininger*, the court was asked to recognize a common-law tort claim for wrongful discharge based on age.  The court stated that in proving the jeopardy element, the plaintiff must prove that "without a common-law tort claim for wrongful discharge based on age, Ohio's clear public policy against age discrimination would be compromised." *Id*. at ¶ 21.  The court stated, "[i]n *Greeley*, the statute involved [that expressed the public policy] did not provide any private remedies *to the employee*, and so a claim at common law was recognized."  (Emphasis added.)  *Id.* at ¶ 22.

**{¶74}** The court in *Leininger* reconciled the holdings in *Wiles* and *Kulch*, 78 Ohio St.3d 134, 677 N.E.2d 308, when considering what should happen if the statutory scheme upon which the public policy is based offers remedies that do not equate to complete relief. The court concluded "it is unnecessary to recognize a common-law claim when remedy provisions are an essential part of the statutes upon which the plaintiff depends for the public policy claim and when those remedies adequately protect society's interest by discouraging the wrongful conduct." *Id*. at ¶ 27. "The jeopardy element necessary to support a common-law claim is not satisfied, because [the statute] adequately protects the state's policy against age discrimination in employment through the remedies it offers to *aggrieved employees*." (Emphasis added.) *Id*. at ¶ 33.

**{¶75}** Therefore, contrary to the defendants' interpretation of the "jeopardy element," the focus is on whether the employee has a proper and adequate remedy for wrongful termination when an employer discharges the employee in violation of the recognized public policy. Only when a remedy does not already exist, or is inadequate, will a court allow a common-law tort claim for wrongful discharge in violation of public policy.

**{¶76}** There is no doubt that a clear public policy exists expressed in R.C. 2151.421 in favor of reporting suspected child abuse. *Powers v. Springfield City Schools*, 2d Dist. Clark. No. 98-CA-10, 1998 Ohio App.LEXIS 2827 (June 26, 1998). This fact has not been disputed by the defendants. Under Ohio law, *anyone* who suspects child abuse may report such abuse. *See* R.C. 2151.421(A)(1)(b) (persons with a

mandatory duty to report child abuse); R.C. 2151.421(B) (allows any person to report suspected child abuse).[2]   A party that owes a mandatory duty to report child abuse and fails to do so, is subject to criminal prosecution and penalties under R.C. 2151.99, and in some cases, is subject to civil liability.   However, a nonmandatory reporter is not subject to criminal penalty.   Based on the language of R.C. 2151.421, neither the defendants nor Kaiser have an affirmative duty to report abuse.

{¶77} Applying the reasoning in *Wiles* and *Leininger* to the facts in this case, R.C. 2151.421 does not provide a remedy to adequately compensate an aggrieved employee who is discharged, disciplined, or otherwise retaliated against in violation of the public policy to report child abuse.   Allowing a common law cause of action for wrongful termination would serve to further the public policy of reporting child abuse.

{¶78} We recognize that Kaiser's own actions do not support her public policy claim.   She did not report the abuse.   And instead of helping to prevent any further abuse to the child by placing a watchful eye in the home, she sabotaged any nanny placement with the father, knowing that the placements she referred to him would be unsuitable. Kaiser, however, claims that she was terminated because she resisted or undermined the *defendants' efforts* to discourage Cruz from reporting the abuse.   Therefore, it is the

---

[2]A review of R.C. 2151.421 does not appear to mandate that in-home private child-care providers, like Cruz, have a mandatory duty to report child abuse. However, under Pennsylvania law, Cruz would have a mandatory duty to report the abuse.   *See* 23 PaC.S. Section 6311(a) "((7) An individual paid or unpaid, who, on the basis of the individual's role as an integral part of a regularly scheduled program, activity or service, is a person responsible for the child's welfare or has direct contact with children;" (13) "an independent contractor").

defendants' own actions that support Kaiser's public policy claim. The evidence suggested that the defendants were trying to prevent Cruz from fulfilling her statutory obligation to report the suspected child abuse. Discharging Kaiser because she resisted and undermined the defendants' efforts to discourage Cruz from reporting child sex abuse jeopardizes the public policy in favor of reporting child abuse.

{¶79} The defendants' own argument that they have no duty to report child abuse proves that Kaiser satisfied the jeopardy argument because the public policy of reporting child abuse was not adequately protected in this instance. Accordingly, no alternative means were in place to promote the public policy of reporting child abuse when the abuse is witnessed and reported by a nonmandatory reporter. While Kaiser and the defendants may not have had a mandatory duty to report the abuse Cruz witnessed, Cruz had a duty under Pennsylvania law, and by attempting to dissuade her from fulfilling that obligation, the defendants' actions violated public policy.

{¶80} Accordingly, the Perritt jeopardy factual propositions as applied to the facts of this case have been proven by Kaiser; thus, proving the jeopardy element — (1) Kaiser refused to follow the defendants' order of dissuading Cruz from reporting the allegation of abuse; (2) Kaiser's conduct furthers the public policy because the conduct is necessary to effective enforcement of the reporting child abuse; and (3) the threat of dismissal will discourage the conduct of supporting a person to report child abuse. *See* 2 Perritt at 43.

{¶81} What is most troubling, however, is that Kaiser's fate at the Placement Agency rested upon her power of persuading an individual to not report the allegation of

abuse. But even if Kaiser had acquiesced to the defendants' request, there was no guarantee that Cruz would be persuaded to not report. Based on the evidence presented, Cruz believed she had an obligation to report the suspected abuse and despite any attempt to dissuade her, she was going to do so. The jury could have reasonably concluded that Kaiser was in a no-win situation. It makes no difference that Kaiser was terminated for resisting or undermining the defendants' efforts to discourage Cruz from reporting the abuse rather than for actually reporting the abuse herself. Under either circumstance, the public policy of child abuse prevention and reporting was jeopardized by the defendants' actions.

**{¶82}** Accordingly, the jeopardy element is satisfied because no law or authority adequately protects the state's public policy to report child abuse. No remedy exists to employees, like Kaiser, who are terminated for supporting the reporting of alleged child abuse. Therefore, the trial court did not err in finding that the jeopardy element was satisfied when denying the defendants' motion for directed verdict and JNOV.

**{¶83}** The defendants' second assignment of error is overruled.

## V. Cross-Appeal

### A. Remittitur — Intentional Infliction of Emotional Distress

**{¶84}** In the first cross-assignment of error, Cruz contends that the trial court abused its discretion by granting defendants' motion for remittitur of the jury's $75,000 economic damages award on her claim for intentional infliction of emotional distress despite the presentation of sufficient evidence to support the verdict.

**{¶85}** Unlike a motion for judgment notwithstanding the verdict that challenges the legal sufficiency of the evidence, a motion for remittitur challenges the weight of the evidence. *Austin v. Chukwuani*, 8th Dist. Cuyahoga No. 104590, 2017-Ohio-106, ¶ 19, citing *Brady v. Miller*, 2d Dist. Montgomery No. 19723, 2003-Ohio-4582, ¶ 12.

**{¶86}** We review a trial court's ruling on motions for remittitur under an abuse of discretion standard. *Shepard v. Grand Trunk W. RR. Inc.*, 8th Dist. Cuyahoga No. 92711, 2010-Ohio-1853, ¶ 81. Under an abuse of discretion standard, the trial court's decision will be reversed only if it is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Additionally, an abuse of discretion may be found when the trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.).

**{¶87}** A court has the inherent authority to remit an excessive award, assuming it is not tainted with passion or prejudice, to an amount supported by the weight of the evidence. In *Chester Park v. Schulte*, 120 Ohio St. 273, 166 N.E. 186 (1929), paragraph three of the syllabus, the Ohio Supreme Court set forth the specific criteria that must be met before a court may grant a remittitur: (1) unliquidated damages are assessed by a jury, (2) the verdict is not influenced by passion or prejudice, (3) the award is excessive, and (4) the plaintiff agrees to the reduction in damages. *See Wightman v. Consol. Rail Corp.*, 86 Ohio St.3d 431, 444, 715 N.E.2d 546 (1999).

{¶88} In this case, the trial court issued a written decision granting the defendants' request for remittitur. However, the trial court's decision does not set forth any of the criteria that must be satisfied prior to granting remittitur, nor can we discern from the court's decision that it even considered the criteria. This lack of consideration renders the court's decision arbitrary.

{¶89} Moreover, nothing in the record demonstrates that Cruz consented to remittitur in lieu of a new trial. Remittitur gives the plaintiff the option of accepting a lower damages award (as determined by the trial judge) or receiving a new trial. "'Where the damages assessed by a jury are excessive, but not in a degree to necessarily imply the influence of passion or prejudice in their finding, the court, in the exercise of a sound discretion, may make the remittitur of the excess the condition of refusing to grant a new trial.'" *Larrissey v. Norwalk Truck Lines*, 155 Ohio St. 207, 219, 98 N.E.2d 419 (1951).

{¶90} Accordingly, Cruz's first cross-assignment of error challenging the trial court's grant of defendants' request for remittitur is sustained. The trial court's decision granting remittitur is reversed, and the matter is remanded for the trial court to reconsider the defendant's motion for remittitur and apply the criteria set forth by the Ohio Supreme Court.

## B. Attorney Fees

{¶91} In this case, the jury, in awarding punitive damages for Cruz and Kaiser against all defendants, determined that those defendants should pay reasonable attorney fees. Cruz and Kaiser originally entered into a contingent fee agreement with their

attorney, whereby their attorney is entitled to 40% of any amount awarded to the plaintiffs, plus expenses. Based on the fee agreement, expenses submitted, and the discounted jury award, the trial court concluded that the total amount of fees under the contingency agreement and covered expenses would be $125,504.45.

{¶92} Nevertheless, plaintiffs' counsel requested fees in the amount of $577,862.92 based on a "lodestar" calculation. After a hearing on counsel's requested fees, the trial court issued a written opinion finding that counsel's conservative estimate of the number of hours he spent on the case was a valid conservative estimate despite defendants' objections. However, the court found that attorney Pattakos's hourly rate of $300 was less valid because (1) it was a contingency fee case; (2) counsel did not present any evidence that this was his customary hourly rate; (3) based on counsel's skill and experience, a reasonable hourly rate would be $150 at the start of the case in 2011, and increasing $25 an hour every year to $250 in 2015.

{¶93} The court also concluded that fees should not be awarded on non-prevailing claims or on unnecessary time that was expended based on attorney Pattakos's conduct. Additionally, the court reduced litigation expenses to only those that an attorney is obligated to pay to perform his work. Based on the court's calculations, the court determined that under the lodestar analysis, the total compensation for attorney Pattakos's hours would be $191,000 with expenses being $17,7782.87, for a total of $208,782.87.

{¶94} However, the court concluded that because counsel was retained under a contingency fee contract and torts are customarily prosecuted under a contingency

contract, the lodestar amount should be deviated downward. Thus, the court ordered that the defendants pay, in addition to the jury's award of punitive and compensatory damages, attorney fees including litigation expenses in the amount of $125,504.45. This amount included the fees that counsel would have received under the contingency fee agreement.

{¶95} In their second assignment of error, plaintiffs contend that the trial court abused its discretion by basing the attorney fee award on the existence of the contingency-fee agreement because it frustrates the purpose of awarding attorney fees to deter those who intentionally inflict serious harm by extreme and outrageous conduct and who put public policy at risk.

{¶96} "Ohio has long adhered to the 'American rule' with respect to recovery of attorney fees: a prevailing party in a civil action may not recover fees as part of the cost of litigation." *Wilborn v. Bank One Corp.*, 121 Ohio St.3d 546, 2009-Ohio-306, 906 N.E.2d 396, ¶ 7. An exception to this rule exists where punitive damages are awarded in tort cases involving fraud, insult, or malice. *Columbus Fin., Inc. v. Howard*, 42 Ohio St.2d 178, 183, 327, N.E.2d 654 (1975), citing *Roberts v. Mason*, 10 Ohio St. 277 (1859). If punitive damages are proper, reasonable attorney fees may be awarded as an element of compensatory damages. *Galmish v. Cicchini*, 90 Ohio St.3d 22, 35, 734 N.E.2d 782 (2000). An award of attorney fees may stem from an award of punitive damages, but "the attorney-fee award itself is not an element of the punitive-damages award." *Neal-Pettit v. Lahman*, 125 Ohio St.3d 327, 2010-Ohio-1829, 928 N.E.2d 421, ¶ 16.

**{¶97}** When determining the amount of attorney fees, a trial court is guided by a two-step determination. The trial court first calculates the "lodestar" by multiplying the number of hours reasonably expended by a reasonable hourly rate, and, second, decides whether to adjust that amount based on the reasonableness factors listed in Prof.Cond.R. 1.5(a). *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 569 N.E.2d 464 (1991), syllabus (applying the predecessor to Prof.Cond.R. 1.5(a); *Am. Chem. Soc. v. Leadscope, Inc.*, 10th Dist. Franklin No. 08AP-1026, 2010-Ohio-2725, ¶ 88. Those factors include the time and labor required; the novelty and difficulty of the questions involved and the requisite skill to perform the legal service properly; the amount of time involved and the results obtained; the experience, reputation, and ability of the lawyer or lawyers performing the services; and whether the fee is fixed or contingent. Prof.Cond.R. 1.5(a).

**{¶98}** "These two inquiries may overlap, however, because several of the reasonableness factors are often subsumed within the initial lodestar calculation and normally will not provide an independent basis for adjusting the fee award." *Miller v. Grimsley*, 197 Ohio App.3d 167, 2011-Ohio-6049, 966 N.E.2d 932, ¶ 14 (10th Dist.), citing *Blum v. Stenson*, 465 U.S. 886, 900, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Freeman v. Crown City Mining, Inc.*, 90 Ohio App.3d 546, 557, 630 N.E.2d 19 (4th Dist.1993). For example, consideration of the results-obtained factor typically is already contained in the determination to calculate a reasonable fee and usually does not provide an independent basis for increasing the fee award. *Freeman* at 557. Thus, in

determining whether hours are unreasonably expended, a trial court inevitably considers some of the reasonableness factors listed in Prof.Cond.R. 1.5.

{¶99} As the United States Supreme Court stated, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services." *Hensley* at 433. Calculation of the lodestar requires the trial court to exclude any hours that were unreasonably expended, e.g., hours that were redundant, unnecessary, or excessive in relationship to the work done. *Miller* at *id*., citing *Gibney v. Toledo Bd. of Edn*., 73 Ohio App.3d 99, 108, 596 N.E.2d 591 (6th Dist.1991), citing *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983).

{¶100} In calculating the lodestar amount, the trial court concluded that attorney Pattakos's claim that he spent 1,122 hours on the case "is, indeed, a conservative estimate." However, the trial court then determined that certain hours were excluded from this number as unnecessary or wasteful, including the first trial that was declared a mistrial, the issues related to the newspaper article, and the hours spent on the nonprevailing claims. Thus, the trial court reduced attorney Pattakos's hours to 1000. This amount only included attorney Pattakos's hours; it did not include hours for any other attorney or support staff who assisted attorney Pattakos in this case.

{¶101} However, the court determined that attorney Pattakos's hourly rate was not reasonable based on his experience. Accordingly, the trial court adjusted the billable

hourly rate to $150 at the start of the case in 2011, and increased the rate $25 an hour every year to $250 in 2015. Based on that calculation, the trial court determined that the lodestar amount was $191,000 just in attorney hours. Again, the court did not include fees for any other attorneys or staff.

{¶102} After calculating the lodestar amount, the trial court was required to consider the relevant factors found in Prof.Cond.R. 1.5(a) in determining whether to deviate from the calculated lodestar figure. From the court's written opinion, the trial court only mentioned two factors — (3) the fee customarily charged in the locality for similar legal services, and (8) whether the fee was fixed or contingent. The court stated that "attorney Pattakos was retained under a contingency fee contract and tort actions are customarily prosecuted under such contracts." Despite mentioning two factors, the trial court really only considered one factor — the existence of the contingency fee agreement. However, a contingency-fee agreement is one of many factors that a court should consider in determining the reasonableness of attorney fees — not the determining factor. *See Borror v. MarineMax of Ohio, Inc.*, 6th Dist. Ottawa No. OT-06-010, 2007-Ohio-562, ¶ 56.

{¶103} Based on this one factor, the trial court deviated downward from its lodestar amount of $191,000, plus expenses, to $77,626.60, plus expenses, based on the contingency fee contract. No consideration was given to the other six relevant factors as they pertained to this four-year litigation that resulted in a 26-day jury trial involving substantial evidence and testimony.

{¶104} This court is mindful that "[u]nless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere." *Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc.*, 23 Ohio App.3d 85, 91, 491 N.E.2d 345 (12th Dist.1985). An award of attorney fees is reviewed for an abuse of discretion. *Einhorn v. Ford Motor Co.*, 48 Ohio St.3d 27, 29, 548 N.E.2d 933 (1990).

{¶105} Based on the entire record, the trial court's award of attorney fees as they would be awarded under a contingent fee agreement shocks the conscience because the court did not consider any fees associated with any other attorney or support staff during this four-year litigation. Even the defendants maintained in their brief opposing attorney fees that the fees incurred by other members of the Chandra Law firm were reasonable. Accordingly, the trial court abused its discretion when it limited the review of attorney fees to only those incurred by attorney Pattakos even though unrefuted documentation was submitted demonstrating that other members of the plaintiffs' litigation team incurred fees. Additionally, the court abused its discretion in deviating from the lodestar amount based solely on the contingency fee agreement.

{¶106} Plaintiffs' second cross-assignment of error is sustained.

### C. Attorney Sanctions

{¶107} In the third assignment of error raised in the cross-appeal, attorney Pattakos contends that the trial court erred as a matter of law by sanctioning him under R.C. 2323.51 for sharing scheduling information and publicly available pleadings with a

newspaper reporter. Attorney Pattakos maintains that his conduct was protected by the First Amendment and permitted by Prof.Cond.R. 3.6.

{¶108} Defendants moved for sanctions against all of plaintiffs' attorneys, including attorney Pattakos, James Rosenthal, and Joshua Cohen, and the law firm of Cohen, Rosenthal, & Kramer, seeking all costs and attorney fees incurred in connection with the March 31, 2015 trial that ultimately was declared a mistrial. Defendants noted five instances of conduct that allegedly warranted sanctions: (1) attorney Pattakos's involvement in the publication of the Scene Magazine article and his representations to the court surrounding his involvement, (2) the law firm's failure to adequately supervise attorney Pattakos's conduct, (3) the law firm's failure to ensure that its attorneys were sufficiently prepared to proceed with trial when attorney Pattakos became unavailable, and (4) that attorney Pattakos's unavailability for trial was undermined by his possible presence at a social gathering and his presence on social media sites. Defendants argued that attorney Pattakos's conduct constituted "frivolous conduct" as defined in R.C. 2323.51(A), and thus, was sanctionable conduct.

{¶109} The trial court issued a written opinion finding that neither the law firm nor any of its partners violated any professional obligations and that attorney Pattakos "did not intentionally commit any act which caused a mistrial." However, the trial court concluded that attorney Pattakos may have violated Prof.Cond.R. 3.6 based on his involvement in the creation and publication of the Scene Magazine article. Accordingly, the trial court set the matter for a hearing on that basis.

**{¶110}** After hearing testimony and reviewing the evidence, the trial court issued a written opinion concluding that "in the context of R.C. 2323.51, the sole purpose of [attorney] Pattakos in urging Scene on March 30 to begin coverage once the trial began was to harass or maliciously injur[e] the defendants outside of the litigation process — that soliciting news media coverage once trial began served no purpose of achieving an orderly or fair adjudicative process or settlement." The court found that attorney Pattakos's actions constituted "frivolous conduct" under R.C. 2323.51. Based on the law and record, however, we must reach a different conclusion.

**{¶111}** Pursuant to R.C. 2323.51, a party adversely affected by frivolous conduct may file a motion for an award of attorney fees. "Frivolous conduct" is defined in objective terms:

> (a) Conduct of a * * * party to a civil action * * * that satisfies any of the following:
>
> (i) It obviously serves merely to harass or maliciously injure another party to the civil action * * * or is for another improper purpose, including, but not limited to, causing unnecessary delay or a needless increase in the cost of litigation.

R.C. 2323.51. Additionally,

> [A]ny party adversely affected by frivolous conduct may file a motion for an award of court costs, reasonable attorney's fees, and other reasonable expenses incurred in connection with the civil action or appeal. The court may assess and make an award to any party to the civil action or appeal who was adversely affected by frivolous conduct."

R.C. 2323.51(B)(1).

**{¶112}** An appellate court reviews a trial court's decision to impose sanctions pursuant to R.C. 2323.51 for an abuse of discretion. *Reddy v. Plain Dealer Publishing Co.*, 2103-Ohio-2329, 991 N.E.2d 1158, ¶ 37 (8th Dist.), citing *Bittner*, 58 Ohio St.3d at 146, 569 N.E.2d 464. The trial court is in the best position to appraise the conduct of the parties, and we must defer to the trial court's ruling on the motion for sanctions. *Reddy* at *id.*, citing *First Place Bank v. Stamper*, 8th Dist. Cuyahoga No. 80259, 2002-Ohio-3109, ¶ 17. However, that discretion is not unfettered, especially when the trial court does not give due consideration to the law regarding attorney and media communication in connection with the facts of the case. An abuse of discretion may be found when the trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, at ¶ 15.

**{¶113}** A review of the case law demonstrates that sanctions are typically imposed under R.C. 2323.51 for frivolous conduct involving pleadings and discovery. We can find no law supporting the award of sanctions under R.C. 2323.51 for the type of conduct here — communicating with the media about a pending case. Usually, this type of conduct is reviewed under the Professional Rules of Conduct under the exclusive jurisdiction of the Ohio Supreme Court. *See Disciplinary Counsel v. Brockler*, 145 Ohio St.3d 270, 2016-Ohio-657, 48 N.E.3d 557 (alleged violation of Prof.Cond.R. 3.6 reviewed by the Board of Professional Conduct of the Supreme Court), *Disciplinary Counsel v. Pullins*, 127 Ohio St.3d 436, 2010-Ohio-6241, 940 N.E.2d 952, ¶ 32 (Section

2(B)(1)(g), Article IV of the Ohio Constitution, vests the Ohio Supreme Court with exclusive original jurisdiction over "admission to the practice of law, the discipline of persons so admitted, and all other matters relating to the practice of law.")

{¶114} Prof.Cond.R. 3.6 provides, in relevant part,

(a)   A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer *knows* or *reasonably should know* will be disseminated by means of public communication and will have a *substantial* likelihood of materially prejudicing an adjudicative proceeding in the matter.

(b) Notwithstanding division (a) of this rule and if permitted by Rule 1.6, a lawyer may state any of the following:
        (1) the claim, offense, or defense involved and, except when prohibited by law, the identity of the persons involved;
        (2) information contained in a public record;
        (3) that an investigation of a matter is in progress;
        (4) the scheduling or result of any step in litigation;

(Emphasis sic.).

{¶115} In *Leadscope*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, the court found it of importance to note that "the lawsuit was not under seal, and the complaint was available to the public.  The public has a legitimate, constitutionally protected interest in judicial proceedings, and the article provided information to educate and inform the public about the case."  *Id*. at ¶ 85.

{¶116} Additionally, the Ohio Supreme Court stated:

We make clear that Ohio law imposes no blanket prohibition on an attorney's communications to the media.  Attorneys and their clients retain a panoply of First Amendment rights and are free to speak to the public about their claims and defenses provided that they do not exceed the contours of protected speech and ethical rules that impose reasonable and necessary limitations on attorneys' extrajudicial statements.  *See*

Prof.Cond.R. 3.6 ("A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter").

*Id*. at ¶ 90.   The court recognized, however, that this right to communicate publicly is not without limitations — "[t]hus, while we do not muzzle an attorney representing a party in a proceeding, attorneys are not given carte blanche to defame others under the guise of litigation." *Id*.   Therefore, as long as the attorney and his or her clients stay within the confines of what constitutes protected speech, and the attorney does not violate   any ethic rules or rules of conduct, i.e. Prof.Cond.R. 3.6, media communication is not prohibited and thus should not be sanctionable.

{¶117} In this case, attorney Pattakos's media communication remained within the confines of protected speech.   The trial court accepted attorney Pattakos's claim that the information he provided to Vince Grzegorek, a Cleveland Scene Magazine reporter, was a public record or involved scheduling.   Our review of the article and the record in the case allow us to conclude that the information contained in the article was information found in the public record.   Additionally, a review of the text message communications between attorney Pattakos and Grzegorek reveal that attorney Pattakos only communicated information about the scheduling of trial.

{¶118} The court also acknowledged that the information attorney Pattakos provided "may very well have been protected by Rule 3.6(b)."   Nevertheless, the court found that attorney Pattakos's involvement caused "a substantial likelihood of materially

prejudicing an adjudicative proceeding." The trial court's reasoning in this matter is ambiguous. If attorney Pattakos's conduct was protected by Rule 3.6, then the communication cannot have caused "a substantial likelihood of materially prejudicing an adjudicative proceeding." *See* Prof.Cond.R. 3.6.

{¶119} The court specifically found that

[Attorney] Pattakos's involvement in publication of the Scene article was a malicious attempt to injure and was intended to "harass" each of the defendants. Mr. Pattakos had a purpose to *defame* defendants when he instructed Mr. Grzegorek on January 20, to "[g]et your reporting pants on. Or at least tell one of your reporters to get his reporting pants on" and on March 30, 2015 notif[ied] Scene that the trial was about to begin.

The record is devoid of any evidence to support the trial court's conclusion that Attorney Pattakos's intentions were to "malicious[ly] attempt to injure" and "harass" and "defame" the defendants. Furthermore, the court made these conclusions despite its express finding that there was "no evidence that Mr. Pattakos knew when an article would be published, what it would contain, or that particular adverse comments about the defendants would be generated."

{¶120} It appears that the trial court attributed the article's content and the magazine's decision to publish the article to attorney Pattakos. The testimony at the hearing, however, as recognized by the trial, reveals that attorney Pattakos did not know when it would be published, what an article would contain, or what comments would be generated. In fact, Grzegorek testified that he assigned the case to one of his reporters, Doug Brown, and provided him with the information. According to Grzegorek, he gave the assignment to Brown because Brown knew how to access public records on a case. It

was Brown who chose not to include the defendants' perspective in the article, not attorney Pattakos.

{¶121} Our review of the record reveals that attorney Pattakos only provided the media with public information and informed an editor about the scheduling and location of trial. If English Nanny was concerned about any news media during the case, it could have requested the court to issue a gag order. In fact, even after the article was discovered, English Nanny did not request a gag order. Furthermore, it must not be ignored that as a result of the article's publication, defense counsel convinced the trial court to rescind its prior order closing the courtroom during Cruz's testimony. Finally, there was no indication that the second jury was tainted by any media publication. Although the voir dire examination of the jurors in the second case was not provided to this court to review, no argument has been raised that the second jury pool — the jury that ultimately decided the case — was tainted or compromised by the Scene Magazine article.

{¶122} The trial court found that Attorney Pattakos's actions of "urging Scene to begin coverage constituted initiating harassment" and "urging Scene to begin news coverage during the course of the trial constituted frivolous conduct." We disagree. Upholding the trial court's decision could have numerous unintended consequences; for example, defendants in criminal cases potentially could ask for sanctions against prosecutors who provide information to the media about criminal cases. On any given day, newspapers show headlines of ongoing trials, recapping the evidence that was

presented that day at trial. In fact, on April 3, 2015, around the same time that Scene Magazine printed the article at issue, a former Cuyahoga County Prosecutor issued a public statement that was published on various news media outlets about the trial of a Cleveland police officer that was set to begin in three days. No sanction was levied against the prosecutor's officer for this public statement. There is always a substantial likelihood that a jury member or potential juror may read a publication or encounter a publication about an upcoming or pending case. However, the judicial system trusts that jury members abide by the instructions to consider the case on the evidence at trial, not the "evidence" in the news media.

{¶123} It should not be held that merely urging a media outlet to cover a trial constitutes frivolous conduct. Whether attorney Pattakos violated Prof.Cond.R. 3.6 is not for this court to decide. Therefore, we find that the trial court abused its discretion in sanctioning attorney Pattakos for engaging in frivolous conduct in violation of R.C. 2323.51 by communicating with the media.

{¶124} Accordingly, the third assignment of error is sustained.

## VI. Conclusion

{¶125} In conclusion, the trial court did not err in denying defendants' motions for directed verdict or JNOV on Cruz's claim for intentional infliction of emotional distress and Kaiser's claim for wrongful termination in violation of public policy. The trial court abused its discretion in (1) granting remittitur by failing to consider the relevant factors and for entering judgment on remittitur prior to Cruz's consent; (2) reducing the

plaintiffs' attorney fee award when its analysis focused entirely on the contingent fee agreement; and (3) finding that attorney Pattakos engaged in frivolous conduct and ordering that he pay defendants' stipulated attorney fees.

**{¶126}** Accordingly, on remand, the trial court is ordered to (1) reconsider the defendants' motion for remittitur in light of the mandatory criteria; (2) reconsider plaintiffs' motion for attorney fees; and (3) vacate the order of contempt against attorney Pattakos, including the stipulated order requiring him to pay defendants' attorney fees.

**{¶127}** Judgment affirmed in part, reversed in part, and remanded.

It is ordered that the parties share equally the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

KATHLEEN ANN KEOUGH, ADMINISTRATIVE JUDGE

PATRICIA ANN BLACKMON, J., and
ANITA LASTER MAYS, J., CONCUR