[Cite as *Burcica v. Ludy*, 2024-Ohio-6038.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| CRISTINA BURCICA, | : | APPEAL NOS. | C-210468 |
| | | | C-230557 |
| Plaintiff-Appellant/Counterclaim | : | | C-220343 |
| Defendant-Appellant/Cross- | | TRIAL NO. | A-1804264 |
| Appellee, | : | | |
| | | | |
| vs. | : | | |
| | | *O P I N I O N* | |
| NATALIE LUDY, | : | | |
| | | | |
| Defendant- | : | | |
| Appellee/Counterclaim Plaintiff- | | | |
| Appellee/Cross-Appellant, | : | | |
| | | | |
| and | : | | |
| | | | |
| CHARLES L. TATE, | : | | |
| | | | |
| and | : | | |
| | | | |
| TATE & TATE ATTORNEYS, LLC, | : | | |
| | | | |
| Appellees. | : | | |

Civil Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are: Affirmed in Part, Reversed in Part, and Cause Remanded; Appeal dismissed in C-220343

Date of Judgment Entry on Appeal: December 27, 2024

*Thomas G. Eagle*, for Plaintiff-Appellant/Counterclaim Defendant-Appellant/Cross-Appellee,

*John Mulvey*, for Defendant-Appellee/Counterclaim Plaintiff-Appellee/Cross-Appellant,

*Reminger Co., LPA, Michael D. Rice* and *Lindsay M. Johnson*, for Appellees.

**BERGERON, Judge.**

{¶1} An ordinary landlord-tenant relationship took a dark turn after the tenant took her young daughter to the doctor and discovered lead-related health issues. The doctor's office, obliged by law to report such matters, notified the appropriate authorities. Enraged by this turn of events, the landlord embarked on a vicious, retaliatory campaign against the tenant that the trial court chronicled in painstaking detail in its posttrial entry awarding the tenant damages based on the landlord's conduct. In fact, the conduct was so outrageous that the trial court imposed punitive damages. While the landlord now endeavors to challenge these damage awards, she fails to succeed under the manifest weight standard of review. We affirm the trial court's judgment in the tenant's favor, and agree with the tenant's cross-appeal that she should have been awarded attorney's fees. We accordingly remand for that limited purpose.

I.

{¶2} In March 2016, defendant-appellee/counterclaim plaintiff-appellee/cross-appellant Natalie Ludy entered into a lease agreement for an apartment located on Marshall Avenue in Cincinnati, Ohio. Ms. Ludy and her young daughter resided on the ground floor of the two-family house and her landlord, plaintiff-appellant/counterclaim defendant-appellant/cross-appellee Cristina Burcica, occupied the upper floor. Upon the expiration of the one-year lease term, the parties entered into a second lease agreement that extended the relationship.

{¶3} The parties interacted amicably at first. The tenor of their relationship abruptly changed in July 2017, however, after Ms. Ludy took her daughter to the doctor for a wellness visit. A blood draw revealed an elevated level of lead in the one-year-old's body. The nurse who phoned Ms. Ludy informed her that the doctor was

required to report the result to the Ohio Department of Health. The department was then obligated to investigate, scheduling an inspection for the Marshall Avenue residence in August.

**{¶4}** When Ms. Ludy explained her daughter's lead results to Ms. Burcica and notified her of the mandatory inspection, Ms. Burcica dismissed any concerns with the property itself. But she then launched a campaign designed to terrorize Ms. Ludy.

**{¶5}** City health officials visited the premises on the scheduled date. Investigator Joseph Wolf and nurse case manager Amy Kolbinsky both testified that Ms. Burcica sought to disrupt and interfere with their inspection. She also sought to redirect their inquiry by telling them that Ms. Ludy's daughter was not walked, did not get enough time outside, was not being exercised, was not bathed enough, and ate from a pet bowl on the floor. Ms. Burcica repeatedly suggested that someone should call 241-KIDS to report Ms. Ludy.

**{¶6}** Nurse Kolbinsky began her assessment once (finally) inside Ms. Ludy's apartment. She testified that the apartment was neat, tidy, and well-kept. She opined that any deterioration in the unit appeared to be the product of normal wear and tear. Upon a visual inspection, Nurse Kolbinsky noted lead concerns pertaining to the floors, doors, doorframes, thresholds, porches, ceiling, cabinets, baseboards, windows, and bathtub. She testified that Ms. Ludy cooperated throughout the process and seemed receptive to educational input. Nurse Kolbinsky did not note anything of concern regarding the child's safety nor anything to indicate any neglect of the child. Investigator Wolf largely echoed Nurse Kolbinsky's assertions. He further testified that the risk assessment revealed multiple lead hazards at the property.

**{¶7}** Shortly thereafter, the city issued an "Order to Control Lead Hazards" notifying Ms. Burcica of the requisite lead abatements to be made. Ms. Burcica failed

to timely comply with the order. Faced with such intransigence, two months later, the city issued a "Notice of Noncompliance and Order to Vacate." In light of this order, Ms. Burcica finally took measures to abate the lead hazards.

**{¶8}** Immediately following the inspection, Ms. Burcica engaged in a pattern of increasingly hostile behavior towards her tenant. Ms. Ludy testified that Ms. Burcica blamed her for the investigation and the concomitant remedial order. Ms. Burcica placed multiple signs on the shared front door of the residence publicly questioning Ms. Ludy's mothering skills. When Ms. Ludy ventured outside on her patio, Ms. Burcica habitually turned off the exterior light (which she controlled) and slammed the door. She loudly cleaned her unit at odd hours and awoke Ms. Ludy's sleeping daughter. She also locked Ms. Ludy's cat in the basement on two occasions.

**{¶9}** The retaliatory campaign soon reached beyond the walls of the house on Marshall Avenue and drove Ms. Ludy out of the premises. Ms. Burcica repeatedly contacted city offices and accused Ms. Ludy of being a "dirty person" and an "unfit mother." She visited Ms. Ludy's places of work and met with members of human resources, with designs on getting Ms. Ludy fired. She followed Ms. Ludy to her new apartment about nine miles from the house on Marshall Avenue, seemingly stalking her. She told people in the community that Ms. Ludy was immoral, on welfare, used illegal substances, was involved in prostitution, and had something to do with the death of her daughter's father. Ms. Burcica's escalating behavior understandably left Ms. Ludy feeling anxious, afraid, and depressed.

**{¶10}** With this backdrop, in June 2018, Ms. Burcica initiated the instant action against Ms. Ludy in the small claims division of the Hamilton County Municipal Court. The complaint levied claims for breach of residential lease and damages beyond normal wear and tear and sought compensation in the amount of $4,714.

{¶11} Ms. Ludy filed an answer and counterclaims for rent abatement, retaliation, violations of Ohio's Landlord-Tenant Act, emotional distress, breach of contract, unjust enrichment, failure to return security deposit, invasion of privacy, punitive damages, and attorney's fees. Because the damages sought on the counterclaims exceeded the jurisdictional threshold of the small claims court, the case was transferred to the court of common pleas.

{¶12} In the nearly two-and-a-half years that followed, the parties exchanged numerous, contentious filings with little actual progress achieved. Relevant to the instant consolidated appeal, Ms. Ludy filed a motion for sanctions and attorney's fees in February 2021, which the court held in abeyance. Also of note, though Ms. Burcica initially retained counsel, she subsequently elected to proceed pro se partway through the case. In June 2021, the matter finally proceeded to a five-day trial to the bench.

{¶13} On August 13, 2021, the trial court entered a judgment denying Ms. Burcica's claims and finding in favor of Ms. Ludy on the majority of her counterclaims. The court awarded Ms. Ludy $49,886.32 in damages altogether. This included $550 in rent abatement for August 2017, $550 in returned rent for September 2017, $535 for return of the security deposit (doubled to $1,070 because the security deposit was wrongfully withheld), $2,733.16 in damages for constructive eviction and related moving expenses, $40 in lost wages, $20,000 for intentional infliction of emotional distress, and $24,943.16 in punitive damages (an amount reflecting the sum of the compensatory damages). The trial court denied Ms. Ludy's request for attorney's fees (the motion previously held in abeyance).

{¶14} A few weeks later, Ms. Ludy filed a postjudgment motion seeking costs and attorney's fees in the amount of $108,099 for litigating the violations of Ohio's Landlord-Tenant Act. Two days later, Ms. Burcica filed a notice of appeal from the

trial court's August 13 judgment (C-210468). Ms. Ludy cross-appealed the judgment as well. Thereafter, in September, Ms. Ludy filed a motion for sanctions and attorney's fees against Ms. Burcica and her prior counsel, Charles Tate, for violations of Civ.R. 11 and R.C. 2323.51. We stayed the appeal numbered C-210468 and remanded the matter to the trial court to dispose of the pending motion.

{¶15} Mr. Tate subsequently moved to strike and alternately opposed the motion for sanctions and attorney's fees. The trial court eventually granted the motion to strike and dismissed Mr. Tate and his law firm from the action. Ms. Ludy timely filed a notice of appeal from that judgment (C-220343).[1]

{¶16} In August 2022, we stayed the consolidated appeal and issued a second remand to dispose of the remaining motion for costs and attorney's fees filed by Ms. Ludy the prior September. In an entry dated September 22, 2023, the trial court denied the motion. Ms. Ludy timely appealed that judgment (C-230557), which we consolidated with the other appeals.

II.

A.

{¶17} Ms. Burcica presents four assignments of error in her appeal. In her first assignment of error, she advances a variety of arguments concerning the rejection of her affirmative claims for relief, with multiple subarguments.

i.

{¶18} First, Ms. Burcica insists that the trial court erred in denying her full claim of damages. She points to Civ.R. 54(C) for the prospect that the trial court

---

[1] We note that Ms. Ludy failed to assign any error concerning the trial court's judgment granting Mr. Tate's motion to strike the motion for sanctions and attorney's fees. Consequently, we dismiss the appeal numbered C-220343. *See Hinkle v. Mingo*, 2024-Ohio-1665, ¶ 10 (10th Dist.), citing App.R. 12(A)(2) and 16.

6

wrongly limited her evidence to that concerning her small claims complaint, maintaining that she adduced "substantial evidence" of other "harm." At the start of trial, the court noted that Ms. Burcica had filed a complaint seeking $4,714 in damages. The judge noted for the record that Ms. Burcica disclosed paperwork that morning indicating that she now sought $40,749 in damages. The court explained that the matter set for trial contemplated only the initial complaint seeking $4,714 in damages, not the new, inflated damages. Ms. Burcica neither objected to the ruling nor proffered the "paperwork" into the record for appellate review. Therefore, we lack the ability to consider this evidence.

**{¶19}** Relevant to judgments obtained other than by default, Civ.R. 54(C) provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded the relief in the pleadings." Contrary to Ms. Burcica's argument, however, the rule does not afford parties an unfettered right to substantially alter the relief sought on the morning of trial with no notice to the opposing party. *See Masny v. Vallo*, 2005-Ohio-2178, ¶ 18 (8th Dist.) (observing that the spirit of Civ.R. 54(C) contemplates damages being sufficiently pled to put the opposing party on notice of potential liability so they can decide whether to appear and defend).

**{¶20}** While Civ.R. 54(C) contemplates some ability to allow amendments to a complaint at a later date, the record does not indicate that Ms. Burcica in fact made any effort to amend her complaint. *See Germadnik v. Auld*, 2018-Ohio-2889, ¶ 12-17 (11th Dist.) (party seeking recovery beyond that requested in complaint remains subject to the timeliness and procedural constraints in Civ.R. 15(A) and (B) governing amendments of pleadings). Nor did Ms. Burcica present any argument explaining what the documents were or why it was necessary to admit them. Moreover, as noted

above, the documents were not included in the record for appellate review. *See Cwik v. Cwik*, 2011-Ohio-463, ¶ 96 (1st Dist.) (proponent cannot demonstrate prejudice in exclusion of documents as evidence at trial where documents were not proffered as exhibits for appellate review).

**{¶21}** In view of these omissions, we hold that Ms. Burcica failed to sufficiently demonstrate why Civ.R. 54(C) warranted that she be permitted to substantially amend her prayer for relief on the morning of trial. *See Mallory v. Mallory*, 2024-Ohio-5458, ¶ 7 (1st Dist.) (noting that the party assigning error bears the burden to support his or her contentions by directing the reviewing court's attention to pertinent record citations and legal authorities); *see also Guthrie v. Guthrie*, 2024-Ohio-5581, ¶ 12-15 (1st Dist.) (observing that appellant failed to cite to the record and to appropriately develop the arguments in her merit brief and cite to supporting legal authorities).

ii.

**{¶22}** Next, Ms. Burcica challenges the trial court's determination that she was not entitled to compensation for the physical damages to the premises ostensibly exceeding ordinary wear and tear. Her complaint sought compensation for windows painted shut, carpet replacement, cleaning of the unit, wall repairs, and six months' unpaid rent.

**{¶23}** Of note, we review an award of damages after trial in a landlord-tenant dispute through the lens of manifest weight. *Hensel v. Childress*, 2019-Ohio-3934, ¶ 24 (1st Dist.). The ultimate inquiry on manifest weight review concerns whether, after weighing all evidence and assessing the credibility of the evidence and witnesses, the trial court clearly lost its way in rendering its verdict. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist. 2001). In assessing whether a trial court's judgment runs counter to the manifest weight of the

evidence, we consider whether the judgment was supported by the greater amount of credible evidence and whether the plaintiff met her burden of persuasion by a preponderance of the evidence. *Hyde Park Circle LLC v. City of Cincinnati*, 2016-Ohio-3130, ¶ 15 (1st Dist.).

**{¶24}** A tenant is generally obligated to surrender the premises to the landlord in a condition akin to that when received, excepting normal wear and tear. *Hensel* at ¶ 26. The landlord bears the burden of demonstrating that the alleged damages exceed the threshold of ordinary wear and tear. *See id*. at ¶ 28. Here, despite Ms. Burcica's claims of excessive damage to the unit, the record supports the trial court's finding that the damage resulted only from normal wear and tear. Ms. Ludy offered evidence in the form of a video walk-through commemorating the condition of the apartment upon her moving out. Multiple witnesses, including the contractor called to testify on Ms. Burcica's behalf, testified that the unit was well-kept and in good shape. We decline to disturb the trial court's classification of the evidence as ordinary wear and tear on manifest weight review.

iii.

**{¶25}** The balance of Ms. Burcica's first assigned error contests the trial court's rejection of her damage claim related to the early termination of the lease agreement between the parties. The record indicates that six months remained on the lease term when Ms. Ludy vacated the premises in September 2017. Nonetheless, the trial court declined to award any damages for any future rent owed because the parties mutually terminated the lease. The record supports this determination. Parties to a contract can terminate the agreement by mutual consent and consideration at any time. *Reiter Dairy, Inc. v. Ohio Dept. of Health*, 2002-Ohio-2402, ¶ 15 (10th Dist.). That is what happened here.

**{¶26}** The record indicates that Ms. Ludy sought to vacate the premises after Ms. Burcica yelled at her and placed derogatory notes on the front door immediately following the lead inspection (in addition to the pattern of activity described above). In response to questions about unpaid rent at trial, Ms. Burcica testified, "I let her go. You know, I just let her go." She also acknowledged that one of her prior attorneys told Ms. Ludy's counsel that Ms. Ludy was free to vacate the premises. The trial court found the communications between counsel showed that Ms. Burcica agreed to release Ms. Ludy from her lease obligations as of August 31, 2017. Ms. Burcica appears to challenge this finding for lack of consideration. But Ms. Burcica received consideration in the form of Ms. Ludy returning possession of the premises to her and her being mutually relieved of any further obligations or duties under the lease. Accordingly, we cannot say that the trial court's denial of an award of damages for unpaid rent was not supported by the evidence.

**{¶27}** Based upon the foregoing, we overrule the first assignment of error.

B.

**{¶28}** In the second assignment of error, Ms. Burcica maintains that the trial court erred in awarding compensatory damages to Ms. Ludy. She presents five different subarguments, several of which are not reasonably developed. Each of these arguments is subject to manifest weight review. We take the arguments in turn.

i.

**{¶29}** Ms. Burcica initially challenges the trial court's award of moving expenses as damages for constructive eviction despite the court's finding of a mutual agreement for Ms. Ludy to vacate the premises. After a comprehensive review of the record, we see no manifest weight error here.

**{¶30}** Ohio law holds that a tenant is constructively evicted from the leased

10

premises when the landlord's acts of interference compel the tenant to leave, effecting a dispossession despite the fact that the tenant was not forcibly ejected by the landlord. *JAL Dev., Ltd. v. LivFitNutrition, LLC*, 2014-Ohio-3830, ¶ 11 (1st Dist.). As indicated above, the trial court found the parties mutually agreed that Ms. Ludy could vacate the premises. Contrary to Ms. Burcica's arguments, however, this finding was not inconsistent with the court's finding of constructive eviction. The record indicates that Ms. Ludy only agreed to leave *after* Ms. Burcica's retaliatory conduct compelled her to leave. Nor does Ms. Burcica point to any authority that disallows a finding of constructive eviction where the tenant ultimately moves out in accordance with an agreement reached as a direct consequence of the landlord's improper conduct. In such a situation, the landlord's improper conduct is still what compelled the tenant to leave. Accordingly, we find that the trial court did not err in awarding Ms. Ludy damages for moving expenses due to her constructive eviction.

ii.

{¶31} Next, Ms. Burcica argues that the trial court erred in awarding damages for lost wages. In connection with this argument, Ms. Burcica fails to explain the basis for the manifest weight problem. She includes only a single sentence of argument on this point in her brief, and the argument does not provide any citation to the record. An appellant must do more to demonstrate error on appeal. *See Mallory*, 2024-Ohio-5458, at ¶ 7 (1st Dist.); *Guthrie*, 2024-Ohio-5581, at ¶ 12-15 (1st Dist.).

{¶32} From what we can tell, the record demonstrates that Ms. Burcica visited Ms. Ludy's two employers, Caracole and Corryville Catholic, on the same day in November 2017 for the purposes of harassing her or trying to get her fired. Ms. Ludy was at Caracole when Ms. Burcica arrived and left work as a result of her intrusion. The trial court thus awarded Ms. Ludy $40 in lost wages. That award comports with

the manifest weight of the evidence in light of the never-ending campaign of harassment that Ms. Burcica was waging at that point. We therefore decline to overturn the award for lost wages.

iii.

**{¶33}** Next, in her third and fourth subarguments, Ms. Burcica challenges the trial court's damages award for intentional infliction of emotional distress. As with the prior issue, Ms. Burcica fails to develop either of these arguments beyond a conclusory level.[2] On her fourth point, for instance, she complains that the damages were too high, but fails to explain *why*, mustering only a sentence of argument in support. She accordingly leaves us nothing of substance to review there with respect to the amount of damages.

**{¶34}** Her related (third) argument, that "Ludy presented nothing severe or disabling" consumes but a paragraph of argument, and it provides us no basis for reversal. Her brief fails to acknowledge or address the crucial fact that the trial court indeed found that her conduct caused Ms. Ludy to suffer serious emotional distress. The trial court issued detailed findings in its judgment entry supporting the various elements of the tort of intentional infliction of emotional distress. On appeal, Ms. Burcica neglects to challenge those findings or otherwise explain why they defied the manifest weight of the evidence.

**{¶35}** Instead, Ms. Burcica suggests that the trial court went astray because no evidence established that Ms. Ludy underwent any medical treatment or

---

[2] The dissent creates several arguments for Ms. Burcica that are simply not in her brief, nor were they raised at trial below. Relying mostly on summary judgment authority, the dissent expounds on a "sufficiency of evidence" argument. Ms. Burcica's brief didn't advance a "sufficiency of evidence" argument—rather, it made a manifest weight argument in one paragraph. The dissent conflates these concepts and actually weighs the evidence, despite professing not to. We feel constrained to respond to the brief that Ms. Burcica actually filed, rather than speculating on one that she might have filed.

counseling. The law does not impose such a blanket requirement upon a successful claim for intentional infliction of emotional distress. *See Yeager v. Local Union 20, Teamsters*, 6 Ohio St.3d 369, 374 (1983) ("we hold that in order to state a claim alleging the intentional infliction of emotional distress, the emotional distress alleged must be serious"); *see also Buckman-Peirson v. Brannon*, 2004-Ohio-6074, ¶ 41 (2d Dist.) (observing, "in Ohio at least, expert medical testimony concerning the plaintiff's mental distress is not always required. Ohio courts have held that, as an alternative to and in lieu of expert testimony, a plaintiff may offer the testimony of lay witnesses acquainted with the plaintiff to show significant changes that they have observed in the emotional or habitual makeup of the plaintiff."). Rather, such a claim will lie where adequate evidence exists that the actor, through extreme and outrageous conduct, intentionally or recklessly caused serious emotional distress to another. *Yeager* at 374, citing 2 Restatement of the Law 2d, Torts, § 46(1), at 71 (1965). Tellingly, Ms. Burcica does not dispute that her conduct was extreme and outrageous.

**{¶36}** The trial court's judgment meticulously detailed the facts in the record supporting its findings that Ms. Burcica intended to cause Ms. Ludy serious emotional distress, her conduct was extreme and outrageous, and her conduct proximately caused Ms. Ludy to suffer serious emotional distress. Admittedly, the trial court was presented with two versions of events. Ms. Burcica spent much time on direct examination narrating how she felt she was persecuted, stalked, and harassed by Ms. Ludy and her attorney for years, chased out of Ohio, and financially ruined. Conversely, Ms. Ludy chronicled Ms. Burcica's retaliatory campaign against her that commenced the same day as the lead inspection. Both sides called witnesses to testify in support of their respective depictions. In the end, the trial court found that "the evidence [was] overwhelming that Burcica [was] intent on wreaking havoc on Ludy's

life."

**{¶37}** The trial court's decision detailed how Ms. Burcica's retaliatory campaign commenced while Ms. Ludy still resided at the apartment and escalated once Ms. Ludy reached out for relocation assistance. The court noted that Ms. Burcica began levying personal attacks against Ms. Ludy and making offensive claims about her to anyone who would listen. In addition, the court found that Ms. Burcica visited Ms. Ludy's employers "with the intent to stalk or otherwise get Ludy fired[.]" Ms. Burcica's conduct had only "grown more outrageous" as the litigation progressed, in the trial court's view. The court expressly found that "Burcica's actions have been excessive, wanton, and at times gross."

**{¶38}** When confronted on cross-examination, Ms. Burcica minimized her actions or simply dodged questions asked of her. The trial court further detailed the emotional toll that Ms. Burcica's actions over the years exacted upon Ms. Ludy. Ms. Ludy testified to experiencing stress, anxiety, fear, depression, and weight loss. Her former neighbor on Marshall Avenue described Ms. Ludy's transformation from a "happy and joyful" person to "incredibly anxious" and "stressed out." The court did not hesitate to conclude that "Burcica's conduct was the proximate cause of Ludy's serious emotional distress."

**{¶39}** Credibility is of paramount importance on manifest weight review, particularly in the face of conflicting evidence. We remain mindful that the factfinder sits in the best position to assess credibility by observing the demeanor, gestures, and voice inflections of the witnesses testifying at trial. *Eastley*, 2012-Ohio-2179, at ¶ 21; *Mehta v. Johnson*, 2022-Ohio-3934, ¶ 8 (1st Dist.), quoting *Risch v. Samuel*, 2020-Ohio-1094, ¶ 21 (1st Dist.). That is why the law affords a legal presumption in favor of the factfinder in a manifest weight assessment. *See Eastley* at ¶ 21.

14

**{¶40}** Here, the trial court attributed greater credibility to the assertions of Ms. Ludy and her supporting witnesses. Ms. Burcica's brief stands silent beyond conclusory suggestions as to why the trial court's findings were erroneous. While the evidence at trial was certainly disputed, given the presumption that we are to apply in favor of the trial court's verdict, we cannot say that the trial court's judgment ran counter to the manifest weight of the evidence. This case presents an outrageous example of unabated, and unrepentant, harassment of one individual upon another—a cruelty inflicted that no one should have to endure. The trial court was well-acquainted with the history here and was highly capable of evaluating the severity of Ms. Ludy's emotional distress. We accordingly decline to disturb its judgment for intentional infliction of emotional distress or the damages award thereon.

iv.

**{¶41}** The final issue under Ms. Burcica's second assigned error challenges the trial court's award of damages for rent abatement where, in her estimation, there was not sufficient evidence that the premises was "worthless." The trial court found that Ms. Burcica's actions prevented Ms. Ludy's quiet enjoyment of the premises and, as a result, Ms. Ludy was entitled to rent abatement for a little more than a one-month period. A tenant is entitled to an abatement of rent so long as the landlord remains in default. *Gammarino v. Smith*, 2007-Ohio-4073, ¶ 29 (1st Dist.). A tenant's testimony as to the extent of the defects, even if not accompanied by the monetary value of the defective property, provides sufficient evidence on which to base a damages award. *Id.* at ¶ 33.

**{¶42}** Here, when asked what the value of the property was to her in August 2017, Ms. Ludy replied, "I would have paid to not have lived there in August." This reflected a negative value for the apartment unit in Ms. Ludy's mind. No evidence was

15

offered to rebut this testimony. Consequently, we cannot say that the trial court's award of damages for rent abatement was not supported by the evidence.

**{¶43}** Based upon the foregoing, we overrule the second assignment of error.

C.

**{¶44}** In the third assignment of error, Ms. Burcica argues that the trial court's award of punitive damages was inappropriate without sufficient evidence of her wrongful intent to harm Ms. Ludy.

**{¶45}** A tenant is entitled to recover punitive damages where he or she proves actual damages resulting from the landlord's conduct and also proves fraud, insult, or malice on the landlord's part. *Meacham v. Miller*, 79 Ohio App.3d 35, 40 (4th Dist. 1992). A showing of malice entails proof of "hatred, ill will, or revenge, or 'a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'" *Id.*, quoting *Preston v. Murty*, 32 Ohio St.3d 334, 336 (1987).

**{¶46}** Ms. Ludy testified about Ms. Burcica's conduct that began after the lead investigation at the premises. She said that Ms. Burcica engaged in behavior such as loudly cleaning and slamming a mop against Ms. Ludy's door at 5:00 a.m., telling Ms. Ludy that she was going to be arrested for drug "perennials," threatening eviction, frequently talking on the phone very loudly outside of Ms. Ludy's door, mentioning Ms. Ludy on the phone with others, slamming doors, engaging in confrontations every time Ms. Ludy ventured outside, turning off the electric at the premises in an attempt to stop Ms. Ludy's cameras from recording, showing up at Ms. Ludy's places of work, telling others that Ms. Ludy was a "substance abuser" and a "prostitute," and suggesting to others that Ms. Ludy was involved in the death of the child's father. Ultimately, the evidence supports that Ms. Burcica disrupted the quiet enjoyment of

16

the premises, spread allegations and rumors about Ms. Ludy, disparaged her, suggested that she was a bad mother, showed up to her places of employment twice, and attempted to convince Ms. Ludy's witnesses not to appear at trial.

{¶47} The trial court found Ms. Burcica's malice was "readily apparent" from the evidence and that Ms. Burcica did not hide her disdain for Ms. Ludy and her counsel. The court further found that Ms. Burcica showed no remorse for her actions and, in fact, appeared to enjoy publicly humiliating Ms. Ludy. Accordingly, the court deemed appropriate a punitive damages award in an amount equal to the compensatory damages award. Based on our review of the record, we cannot say that these findings were not supported by the evidence. Therefore, we overrule the third assignment of error.

D.

{¶48} In the fourth assignment of error, Ms. Burcica asserts that the trial court erred in awarding damages to Ms. Ludy that punished her "for litigation." However, such an assertion is not reflected in the record as the trial court never awarded any damages to Ms. Ludy that punished Ms. Burcica for litigation. Rather, the trial court simply observed that Ms. Burcica continued her pattern of making certain attacks toward Ms. Ludy even in official court documents. Because Ms. Burcica fails to identify any improper ruling in the record in this regard, we overrule the fourth assignment of error.

III.

{¶49} In her sole cross-assignment of error, Ms. Ludy argues that the trial court erred in declining to award her statutory attorney's fees under Ohio's Landlord-Tenant Act. We agree.

{¶50} A trial court's decision on a prayer for attorney's fees is generally

subject to review for an abuse of discretion. *Hensel*, 2019-Ohio-3934, at ¶ 15 (1st Dist.). The trial court's August 13, 2021 entry indicates that it found Ms. Burcica violated R.C. 5321.15(A) and 5321.16 of Ohio's Landlord-Tenant Act. Of note, these findings have not been challenged on appeal. Despite these findings, the trial court denied Ms. Ludy's claim for attorney's fees after trial and after she filed a post-judgment motion for attorney's fees. The court did not provide any rationale for the denial.

**{¶51}** An award of attorney's fees for a violation of either of these provisions of Ohio's Landlord-Tenant Act is mandatory. *Risch*, 2020-Ohio-1094, at ¶ 14 (1st Dist.) (observing, "[u]nder the plain language of the statute, an award of attorney fees is mandatory where a landlord violates R.C. 5321.15(A) or (B)"); *Smith v. Padgett*, 32 Ohio St.3d 344, 349 (1987) (holding that, under R.C. 5321.16(B) and (C), a landlord's liability for damages and attorney's fees is mandatory).

**{¶52}** Further, because statutory attorney's fees in landlord-tenant cases are assessed as costs rather than damages, courts have held that "a tenant is not required to offer evidence of the amount of those attorney fees at trial." *Gaitawe v. Mays*, 2012-Ohio-4749, ¶ 16 (2d Dist.). Rather, "[a]n evidentiary hearing may be held to determine the reasonable amount of attorney fees to be awarded following a judgment finding that the tenant is entitled to attorney fees." *Id.*

**{¶53}** Because the trial court found that Ms. Burcica violated R.C. 5321.15(A) and 5321.16 but failed to award the statutorily mandated attorney's fees therefor, we hold that the trial court abused its discretion. Ms. Ludy's cross-assignment of error is sustained and we remand for the trial court to consider the fee request and award an appropriate amount of attorney's fees (and we take no position on what that number might be).

* * *

**{¶54}** Based upon the foregoing, we overrule Ms. Burcica's first, second, third, and fourth assignments of error. We sustain Ms. Ludy's cross-assignment of error. The cause is remanded to the trial court to award Ms. Ludy attorney's fees for Ms. Burcica's violations of Ohio's Landlord-Tenant Act. Finally, the appeal numbered C-220343 is dismissed.

Judgment accordingly.

**KINSLEY, J.,** concurs.
**ZAYAS, P.J.,** concurs in part and dissents in part.

**ZAYAS, P.J.,** concurring in part and dissenting in part.

**{¶55}** In large part, I concur in the majority's decision on the numerous issues presented in this case. However, despite the majority's captivating presentation of the facts, I must write separately as to the trial court's award of damages to Ludy for lost wages and intentional infliction of emotional distress ("IIED"). I dissent from the majority's opinion as to the award of damages to Ludy for IIED because, when applying the law, the trial court's determination should be reversed as Ludy failed to present the requisite evidence in support of her self-serving statements to establish that the emotional distress she underwent qualified as serious, i.e., was severe and debilitating. I concur with the majority's decision as to the award of damages for lost wages but do so by narrowly applying the sole issue presented for review.

## I.  IIED

### A.  *Pertinent Legal History of IIED Claims*

**{¶56}** In *Yeager v. Local Union 20, Teamsters*, 6 Ohio St.3d 369 (1983), the Ohio Supreme Court established that, "'[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to

liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.'" *Id.* at 373, citing 2 Restatement of the Law 2d, Torts, § 46(1), at 71 (1965).

**{¶57}** Prior to this decision, Ohio did not recognize an independent claim for IIED. *See id.* "The reasoning behind the refusal to recognize this cause of action was that "'[t]he damages sought to be recovered are too remote and speculative. The injury is more sentimental than substantial. Being easily simulated and hard to disprove, there is no standard by which it can be justly, or even approximately, compensated.'"" *Id.*, quoting *Bartow v. Smith*, 149 Ohio St. 301, 311 (1948).

**{¶58}** So, when the Ohio Supreme Court finally adopted IIED as an independent tort claim, it did so with the mind of adopting a stringent standard that ensured recovery only in cases that involved genuine and serious emotional distress. *See id.* It found such a standard to be "succinctly spelled out" in the Restatement, and so this standard—set forth above—became the law in Ohio. *Id.*, citing 2 Restatement, § 46(1) at 71.

**{¶59}** Earlier that same year, the Court also recognized a claim for negligent infliction of emotional distress, without the requirement of any accompanying physical injury.[3] *See Paugh v. Hanks*, 6 Ohio St.3d 72, 77 (1983); *Schultz v. Barberton Glass Co.*, 4 Ohio St.3d 131 (1983). The change in direction to recognizing these independent claims for emotional distress, without the requirement of any accompanying primary tort or physical injury, arose from "the realities of modern medical and psychiatric advancements" that made psychic injury capable of being proven. *See Yeager*, 6 Ohio St.3d at 374, citing *Paugh*.

---

[3] *See generally Heiner v. Moretuzzo*, 73 Ohio St.3d 80 (1995) for a discussion of limitations and how the law has developed for claims of negligent infliction of emotional distress.

**{¶60}** However, in adopting these independent emotional-distress claims, the Ohio Supreme Court emphasized that "seriousness" is a necessary element for such claims. *Id.*, citing *Paugh*. It said that "serious" implies a level of emotional distress that goes "beyond trifling mental disturbance, [or] mere upset or hurt feelings." *Paugh* at 78. Rather, the experienced emotional distress must be "both severe and debilitating." *Id.* In other words, serious emotional distress may only be found "where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." (Citations omitted.) *Id.* The Court listed some examples of serious emotional distress as "traumatically induced neurosis, psychosis, chronic depression, or phobia." (Citation omitted.) *Id.*

**{¶61}** Further, the court addressed the question of proof. *Id.* at 80. The court said that "expert medical testimony can assist the judicial process in determining whether the emotional injury is indeed, serious." *Id.*, citing *Schultz*. "However, lay witnesses who are acquainted with the plaintiff, may testify as to any marked changes in the emotional or habitual makeup that they discern in the plaintiff after the [alleged conduct] occurred." *Id.* Beyond that, "[t]he jurors themselves, can refer to their own experiences in order to determine whether, and to what extent, the defendant's conduct caused the serious emotion[al] distress." (Citation omitted.) *Id.*

**{¶62}** Accordingly, in the wake of the Ohio Supreme Court's decisions in *Yeager* and *Paugh*, evidence of severe and debilitating emotional injury has been held, as a matter of law, to be insufficient where the claimant does not offer any expert or third-party testimony, nor any evidence that he, she, or they sought medical treatment for any of the claimed emotional distress. *See, e.g., Risch v. Friendly's Ice Cream Corp.*, 136 Ohio App.3d 109 (1st Dist. 1999); *Stancik v. Deutsche Natl. Bank*, 2015-Ohio-2517 (8th Dist.); *Georgin v. Georgin*, 2022-Ohio-4328 (12th Dist.).

**{¶63}** For example, in *Risch*, this court held that summary judgment was appropriately granted in favor of the defendant on the plaintiff's claim for IIED where the plaintiff stated that she suffered from stress and nightmares and said that she sometimes vomited while going home from work—the place where the alleged conduct was occurring—but put forth no allegations that she was forced to seek medical or psychiatric treatment or evidence that she was unable to function in her daily life. *Risch* at 115.

**{¶64}** Similarly, the Eighth District held in *Stancik* that summary judgment was appropriately granted in favor of the defendant on the plaintiff's claim for IIED where the plaintiff asserted that he was humiliated, shamed, and ridiculed as a result of the alleged conduct and experienced significant medical issues as a result of the stress, but offered no evidence from any expert or third party as to the emotional distress he suffered and no evidence was presented that he sought medical treatment for any alleged emotional distress. *Stancik* at ¶ 45.

**{¶65}** Likewise, the Twelfth District held in *Georgin* that summary judgment was appropriately granted in favor of the defendant on the plaintiff's claim for IIED where the plaintiff alleged that she suffered humiliation, embarrassment, fear, anxiety, mental anguish, and severe emotional distress, and had difficulty sleeping at night, but failed to present evidence establishing that the fear, anxiety, and mental anguish rendered her unable to function in her daily life or that she sought or received any mental treatment for emotional distress arising from the alleged incident. *Georgin*, 2022-Ohio-4328, ¶ 43 (12th Dist.).

**{¶66}** These cases can be contrasted with this court's decision in *Uebelacker v. Cincom Systems, Inc.*, 48 Ohio App.3d 268, 276 (1st Dist. 1988), in which we held that the evidence presented on summary judgment was sufficient to create an issue of

fact as to whether the plaintiff suffered severe and debilitating emotional injury where the plaintiff alleged that, as a result of his alleged wrongful discharge and other purported extreme and outrageous conduct surrounding this event, he suffered "mental anxiety, emotional distress, loss of self-esteem, depression, humiliation, damage to his reputation and the loss of the respect of family and friends" and presented an affidavit of his wife of 26 years, in which she averred that the plaintiff, from the time of the wrongful discharge until two months after he found new employment, "was highly emotional, moody, tearful, forgetful, distrusting of others, compulsive, uncommunicative, and unsupportive," and said that the plaintiff's distrust of others continued and her concern for his state of mind prompted her to contact a physician on his behalf.

{¶67}   While these cases involve the summary-judgment stage rather than determinations after trial, they nevertheless reflect that Ohio requires that "plaintiffs claiming severe and debilitating emotional injury must present some guarantee of genuineness in support of their claim, such as expert evidence, to prevent a court from" entering judgment as a matter of law in favor of the defendant. *Knief v. Munnich*, 103 Ohio App.3d 103, 108 (3d Dist. 1995), citing *Grote v. J.S. Mayer & Co.*, 59 Ohio App.3d 44, 48 (1st Dist. 1990).

{¶68}   In fact, the Second District held:

[A] plaintiff in a case for intentional infliction of emotional distress must present some evidence beyond the plaintiff's own testimony that he or she has experienced emotional distress due to the defendant's actions.  Though Ohio is not as strict as some states in that it allows claims to proceed based on lay testimony only, there must still be some additional component to the plaintiff's evidence supporting an

allegation of severe emotional distress that provides a 'guarantee of genuineness.'

*Buckman-Pierson v. Brannon*, 2004-Ohio-6074, ¶ 56 (2d Dist.).

**{¶69}** "The severity of a plaintiff's alleged emotional distress may be determined by the court as a matter of law." *Cruz v. English Nanny & Governess School, Inc.*, 2017-Ohio-4176, ¶ 51 (8th Dist.), citing *Paugh,* 6 Ohio St.3d at 78. "'The intensity and the duration of the distress are factors to be considered in determining its severity. . . . It is for the court to determine whether on the evidence severe emotional distress *can* be found; it is for the jury to determine whether, on the evidence, it has *in fact* existed.'" (Emphasis sic.) *Id.*, citing 2 Restatement, § 46, at 77, Comment j.

### B. *The Argument Presented on Appeal*

**{¶70}** Here, Ludy sought damages for IIED based on Burcica's intentional conduct after her daughter tested positive for high levels of lead. The trial court found that Burcica engaged in a "campaign" of disruptions and outbursts while Ludy was still living in the apartment, made outrageous claims about Ludy after Ludy engaged Housing Opportunities Made Equal ("HOME") to look into her claims of retaliation by Burcica, visited Ludy's employer with the intent to stalk or otherwise get Ludy fired, and made repeated personal attacks about every aspect of Ludy's life to anyone willing to listen as the litigation progressed. The trial court found that this conduct was extreme and outrageous and Burcica does not challenge here on appeal that this conduct was extreme and outrageous.

**{¶71}** Interestingly, the majority focuses a substantial amount of its analysis on Burcica's conduct, despite this element not being challenged on appeal. It does so after disregarding the actual argument presented regarding the *seriousness* element

of a claim for IIED, summarily suggesting that the "paragraph" of argument presented by Burcica "provides no basis for reversal." In accordance with the law, I must disagree.

**{¶72}** In Burcica's three paragraph argument as to the award of IIED damages, Burcica first points out that—consistent with the above legal history—a claimant must present some guarantee of genuineness in support of his or her claim of serious emotional distress, such as expert evidence, to prevent a court from entering judgment as a matter of law. She points to two legal authorities that support this legal proposition, and then sets forth a paragraph of argument as to the evidence presented in this case in support of Ludy's claim of damages, arguing, "Ludy presented nothing severe or disabling. It was just the opposite, her own witnesses denying any such degree of harm to Ludy; and there was no 'guarantee of genuineness,' much less to justify any finding in Ludy's favor here." Although Burcica did set forth both a sufficiency and manifest-weight standard of review in her brief, it is clear when considering the substance of her argument that she is challenging the sufficiency of the evidence offered in support of Ludy's claim of serious emotional distress.[4] Further, she does so in more than a conclusory manner, despite the majority's suggestion otherwise. She points to legal authority in support of her position, clearly makes her sufficiency-of-the-evidence argument known, and points to five parts of the record in support of her argument that include portions of testimony from Ludy and her

---

[4] As to the standard of review on this issue, Burcica stated, "To the extent this Issue addresses the existence and terms of a compensable element of a tort claim, it is de novo review. . . . To the extent that it is an assessment and award of damages, it is a manifest weight review." Sufficiency is a test of adequacy and is an issue of law. *See Eastley v. Volkman*, 2012-Ohio-2179, ¶ 11. It speaks to the very existence of the necessary evidence on each element for a tort claim to be compensable. Thus, Burcica very clearly included sufficiency in her standard of review. It was not limited to manifest weight. And, as noted above, the substance of her argument challenges the sufficiency of the evidence.

witnesses regarding Ludy's emotional state.

**{¶73}** Notwithstanding the clear argument presented as to the sufficiency of the evidence offered in support of the *seriousness* element of the IIED claim, the majority disposes of the assigned error utilizing a weight-of-the-evidence analysis. *Compare State v. Rodriguez*, 2024-Ohio-5832, ¶ 7 (1st Dist.), citing *City of Cincinnati v. Twang, LLC*, 2021-Ohio-4387, ¶ 13 (1st Dist.) (addressing the essence of the argument presented for review as sufficiency of the evidence rather than manifest weight). However, "the sufficiency of the evidence is quantitatively and qualitatively different from the weight of the evidence." *Eastley*, 2012-Ohio-2179, ¶ 23. "Sufficiency" is a term of art that is applied to determine whether the cause may proceed to trial or whether the evidence is legally sufficient to support a judgment as a matter of law. *See id.* at ¶ 11.

**{¶74}** Because the majority curtails the argument raised, it is at this point that I depart from the majority's opinion and address the sufficiency of the evidence presented as to the *seriousness* element of the claim for IIED, as argued, rather than considering the weight of the evidence. In doing so, I ultimately agree with Burcica that the evidence presented as to the seriousness of Ludy's claimed emotional distress was insufficient as a matter of law to recover damages for IIED.

### C. Analysis as to the Sufficiency of the Evidence

**{¶75}** In support of her sufficiency argument, Burcica points to *DeBenedictus v. Gialamas*, 1997 Ohio App. LEXIS 246 (11th Dist. Jan. 24, 1997).

**{¶76}** In *DeBenedictus*, the evidence was held to be insufficient as a matter of law to support the defendants' claim for IIED—arising from the plaintiffs' action in attempting to evict them from their home around Christmas time—where the defendants testified that they were upset and distraught by the plaintiffs' actions but

conveyed no other injury nor said that they incurred any medical or psychological expenses. *Id*. at *2-4, 9-12.

**{¶77}** Similarly, in *Buckman-Pierson*, 2004-Ohio-6074 (2d Dist.), the evidence presented was found to be insufficient as a matter of law to support a claim for IIED where the plaintiff testified that, as a result of the claimed verbal and sexual harassment of her former attorney, she discussed her emotional distress with a psychiatrist, who doubled her prescription for the Ativan she was already taking for "nerves and sleeplessness," and her family doctor, who witnessed her crying and having high blood pressure while discussing what she was experiencing, but presented no evidence beyond her own testimony that she suffered severe emotional distress. *Id*. at ¶ 34-35, 56-61. In doing so, the court said, "Had [the plaintiff] offered testimony consistent with her own from any of her doctors, or perhaps from friends or family members who had observed her emotional distress during these times, [the plaintiff]'s claims would likely have survived [judgment as a matter of law]." *Id*. at ¶ 59.

**{¶78}** Importantly, even where lay witness testimony is presented, the supporting testimony presented must be sufficient to support the claim of *severe and debilitating* emotional injury. *See, e.g., Parker v. I&F Insulation Co.*, 1998 Ohio App. LEXIS 1187, *34-35 (1st Dist. Mar. 27, 1998); *Oglesby v. City of Columbus*, 2002-Ohio-3784, ¶ 2, 20-24 (10th Dist.).

**{¶79}** For example, in *Parker*, this court held that the trial court erred in denying a motion for judgment notwithstanding the verdict granting the homeowners' claim for IIED against an insulation company that allegedly intentionally exposed the homeowners to hazardous waste where the evidence presented included a separate contractor's testimony that one homeowner appeared frustrated and powerless and you "could see on his face" what he was going through and the other homeowner

testified that the situation depressed and overwhelmed her and "that the sight of the house made her heart stop," but neither homeowner presented evidence that they sought medical treatment or that the emotional distress interrupted their employment, or presented "any other evidence that would rise to the level needed to prove [IIED]." *Parker* at 34-35.

{¶80} Similarly, in *Oglesby*, the Tenth District affirmed the trial court's grant of summary judgment against the claimant after holding that the evidence was insufficient as a matter of law to support a claim for IIED arising from an employer's alleged actions of falsely accusing the plaintiff of theft and work-duty violations and other surrounding events where the plaintiff presented his own affidavit, in which he stated that his marriage had suffered, he had been unable to eat or sleep properly, and became physically sick when thinking of how he was treated, and the affidavit of his sister, who stated that he had become introverted and irritable following the events and she had witnessed the plaintiff "tear up" and heard his voice crack when he talked about the employer, but offered no medical evidence regarding his claims or any evidence that he sought treatment for the alleged distress. *Oglesby* at ¶ 2, 20-24.

{¶81} In awarding damages for IIED, the trial court relied on Ludy's testimony and the testimony of her former neighbor.

{¶82} At trial, Ludy testified that she experienced fear, anxiety, depression, lack of sleep, lack of ability to concentrate, and weight loss as a result of Burcica's conduct after the lead inspection. She described her depression as "bad" and "fight-or-flight." She further said that there were "days" when she called in sick to work because she didn't sleep or went to bed late the night before because she was thinking about everything. When asked what else she experienced, she said, "I was actually sick. I mean, I wasn't able to eat. I had lost weight since the situation started. I

developed some pretty serious anxiety, especially when it comes to performance at my job and, you know, people popping up places or [Burcica] popping up places." She testified, "I notify people I work with and also I regularly watch my back. I mean, I just keep an eye out." She also testified that she constantly looks out windows and will not let her daughter open the door for anyone. When asked if these "reactions" to Burcica's conduct affected her behavior or performance at work, she replied, "It's possible." When asked to describe the severity level of the anxiety and depression that she experienced, she said, "It's interfered with my life. It's been exhausting."

{¶83} Ludy's former neighbor testified that Ludy was "incredibly anxious" during the period when the conduct was occurring. However, she also testified that Ludy was "understandably anxious" after her daughter tested positive for high levels of lead. When asked to describe the changes she observed between the anxiety from the lead test results and from Burcica's intentional conduct after the lead inspection, she said, "I would say it was the same. She was just generally very anxious." She also testified that Ludy was "stressed out." When asked to describe the changes in stress between the test results and the intentional conduct thereafter, she provided an uncertain response of, "I think the stress level became greater." When asked to describe any visible changes in Ludy's behavior, she said that Ludy went from "happy and joyful" to stressed. She said, "Well, she – you know, she had – you know, her face was – her brow was furrowed and her tone of voice was anxious." She also testified that Ludy came over to her house on one occasion after getting into a dispute with Burcica that resulted in the police being called. She said that Ludy was "almost tearful," extremely anxious, and scared during this event.

{¶84} In considering this evidence, I first emphasize that the claim in question before us is a claim for intentional infliction of emotional distress arising

29

from Burcica's intentional conduct that occurred *after* Ludy's daughter tested positive for high levels of lead. No claim was set forth for negligent infliction of emotional distress, nor was the distress of the lead issue itself presented as any sort of basis for the claimed emotional distress.

**{¶85}** Importantly, courts have held that expert testimony is required where the alleged cause of an IIED plaintiff's emotional injury is inextricably related or intertwined with other potential causes of distress. *See, e.g., Powell v. Grant Med. Ctr.*, 148 Ohio App.3d 1, 8 (10th Dist. 2002) ("Expert testimony was needed to establish a substantial causal relationship between the postmortem injuries to the decedent's body, as distinguished from the death of the decedent, and the serious emotional distress purportedly suffered by plaintiff."); *White v. Bhatt*, 2017-Ohio-9277, ¶ 28 (5th Dist.) ("[E]xpert testimony is necessary to establish a 'substantial causal relationship' between the cause alleged, as distinguished from other possible causes, and the claimed emotional injury suffered by the plaintiff.").

**{¶86}** Thus, any emotional distress that arose from the lead test itself must be distinguished from any emotional distress that occurred as a result of Burcica's intentional conduct in the events that followed the lead inspection.

**{¶87}** Consequently, it is significant that Ludy's neighbor testified that Ludy's anxiety level was "the same" after Burcica's intentional conduct as it was just before when her daughter tested positive for high levels of lead. Because the neighbor did not testify as to any increase in anxiety that was attributable to Burcica's intentional conduct, the testimony of the neighbor, at most, supports that Ludy became more "stressed out" because of Burcica's intentional conduct.

**{¶88}** In arguing in support of the trial court's judgment, Ludy further points to the testimony of the caseworker from HOME and her employer.

**{¶89}** The caseworker from HOME testified that she observed Ludy being "very nervous" during the mediation with Burcica. The caseworker also testified that Ludy would call her "fearing for her life." She said Ludy felt like Burcica was following her and she was "very scared." However, I note that, in the context of IIED, a lay witness is only permitted to "testify as to any marked *changes in the emotional or habitual makeup* that they discern in the plaintiff." (Emphasis added.) *Paugh*, 6 Ohio St.3d at 80. In other words, the testimony must be based on the witness's own observations and not on what the claimant told them. Further, the lay witness must be someone who has the requisite relationship to testify as to such changes in the emotional or habitual makeup of the claimant. *See Powell*, 148 Ohio App.3d at 8. The HOME caseworker only started working with Ludy in the midst of the conduct in question. Thus, the caseworker would not have the requisite relationship to testify as to any marked changes in Ludy's emotional or habitual makeup before and after the conduct occurred. Therefore, at most, the caseworker's testimony supports that Ludy was "very nervous" around Burcica during mediation.

**{¶90}** Ludy's employer testified that Ludy was "somewhat fearful" of what was going to happen and "you could tell that she was going through some things." More specifically, when asked to describe his observations of any changes in Ludy before and after the conduct began, he said, "She was – obviously, there were some concerns. A little, I won't say stressed out, but maybe just a little bit more – I don't know about being depressed, but there were issues that she obviously was aware of and somewhat fearful of, you know, not knowing what – you know, what was going to happen." Importantly, when asked if he saw any changes in her ability to perform at work or focus, he said, "No, I didn't see any changes there." Thus, the employer's testimony supports that Ludy was "somewhat fearful" of what was going to happen

and appeared to be "going through some things." However, the employer's testimony does *not* support that Ludy's ability to function at work was impacted.

**{¶91}** Ultimately, in considering the entirety of the record in this case, I agree with Burcica that the evidence presented is insufficient as a matter of law to support Ludy's claim for IIED arising from Burcica's intentional conduct after the lead inspection. While Ludy testified that she experienced fear, "pretty serious" anxiety, and "bad" depression that "interfered" with her life and affected her concentration, sleep, and eating habits, she failed to present the evidence required to act as a guarantee of the genuineness of her claim in order to establish the requisite level of "seriousness."

**{¶92}** First, the lay-witness testimony was limited and, at most, supports that Ludy was more stressed out, somewhat fearful of what was going to happen, and very nervous around Burcica. While this may be evidence of emotional impact, it does not speak to *severe and debilitating* emotional distress. In fact, the lay-witness testimony actually contradicts Ludy's claim in certain—substantial—ways where the neighbor testified that she did not observe any increase in Ludy's anxiety once the intentional conduct began, and the employer testified that he did not observe any impact on Ludy's ability to function at work. Thus, the lay witness testimony actually serves to undermine Ludy's claim of emotional distress and moves the extent of the emotional impact to a lesser impact than that presented by Ludy's testimony. Accordingly, the lay-witness testimony does not serve to provide the guarantee of genuineness that is required by law to support Ludy's self-serving testimony.

**{¶93}** Beyond that, no expert testimony was presented to support Ludy's claim of severe and debilitating emotional distress nor was any evidence put forth to show that Ludy sought medical treatment or care for her alleged emotional distress.

Rather, the evidence presented to support her claim amounts to her own self-diagnosis of "bad" depression and "pretty serious" anxiety. As set forth above, the law in Ohio does not permit a claimant to rely solely on her own self-diagnosis of severe and debilitating emotional distress. Rather, the claimant must present something further to guarantee the genuineness of the claim, particularly where—like here—the alleged cause of the emotional injury is inextricably related or intertwined with another potential cause of distress.

**{¶94}** Because Ludy failed to present the required supporting evidence to guarantee the genuineness of her self-serving testimony, I would hold that the evidence presented in this case was insufficient as a matter of law to support a claim of damages for IIED under Ohio law. *Compare Meyers v. Hot Bagels Factory*, 131 Ohio App.3d 82 (1st Dist. 1999) (upholding an award of damages for IIED where there was evidence that (1) the claimant was unable to sleep, eat, concentrate, or work, and became less socially active, (2) her friends and family noticed the difference in her personality and told her she needed to seek professional help, (3) the claimant contacted a psychologist and engaged in sessions with the psychologist, (4) the psychologist diagnosed the claimant with post-traumatic stress syndrome, and (5) the psychologist testified that the incident caused the post-traumatic stress syndrome, the claimant's reaction was not an overreaction, and "any woman" would have also reacted strongly to the incident).

**{¶95}** In doing so, I emphasize that I am not assigning any certain weight to any particular piece of evidence. As indicated by the above-outlined cases, IIED claims present a special circumstance in which a claimant's lone testimony as to the severe emotional distress that he or she experienced–regardless of how credible—is not competent evidence from which an award of IIED damages may be made. Thus, in

determining the sufficiency of the evidence presented to support such a claim, this court must look to the evidence offered in support of the claimant's assertions and determine whether—as a matter of law—sufficient supporting evidence was presented to act as guarantee of the genuineness of the claim for IIED damages. *See Cruz*, 2017-Ohio-4176, at ¶ 51 (8th Dist.), citing 2 Restatement, § 46, at 77, Comment j. ("'It is for the court to determine whether on the evidence severe emotional distress *can* be found; it is for the jury to determine whether, on the evidence, it has *in fact* existed.'"). In doing so, we do not look to the credibility of the evidence or its effect in inducing belief. *See Ellis v. Skinner*, 2022-Ohio-4793, ¶ 22 (11th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "Rather, we decide whether, if believed, the evidence can sustain the [judgment] as a matter of law." *Id.*, citing *Thompkins* at 387.

**{¶96}** Here, because the supporting testimony was insufficient as a matter of law for a claim for IIED damages, there was no competent evidence from which the trial court could have awarded the IIED damages since Ludy's testimony about her alleged severe emotional distress *alone* was not competent evidence to support this claim, regardless of how credible she presented. In other words, this is not a situation in which this court should affirm the trial court's judgment based on the weight of the evidence, given that the trial court was in the best position to determine Ludy's credibility. Instead, this is a situation in which, even taking Ludy's testimony and the testimony of the lay witnesses as true, the evidence was simply insufficient as a matter of law to support an award of damages for IIED. Consequently, the trial court's reliance on Ludy's testimony and the testimony of her former neighbor for its award of IIED damages was misplaced for all the aforementioned reasons.

**{¶97}** Accordingly, I would hold that the trial court erred in awarding

34

damages to Ludy for IIED and would therefore sustain the assigned error and reverse the trial court's judgment in this regard.

**{¶98}** Additionally, because I would reverse the trial court's judgment awarding damages to Ludy for IIED, I would also reverse the trial court's award of punitive damages and remand the matter of punitive damages for the trial court to reconsider its award under R.C. 2315.21(D)(2)(a).

## II.   *Lost Wages*

**{¶99}** As to the trial court's award of damages to Ludy for lost wages, I concur in the majority's ultimate decision to overrule the assigned error due to the limited argument that was raised. I write separately to emphasize that the only issue presented regarding this damage award was an argument as to proximate cause. In the argument, Burcica appears to suggest that a claimant's choice to voluntarily leave work somehow breaks the chain of causation. In doing so, she acknowledges the trial court's finding that Ludy left work "because Burcica showed up" at her place of employment and—importantly—does not challenge this finding. Rather, she simply asserts, "It does not appear that a party should be able to attribute their choice to leave their job, as a proximate cause to someone else just showing up, and get paid for not being at work."

**{¶100}** As a general matter, "where an original act is wrongful or negligent and in a natural and continuous sequence produces a result which would not have taken place without the act, proximate cause is established. . . ." *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287 (1981). Based on the trial court's finding, which has not been challenged, Ludy left work because Burcica showed up. In other words, Ludy would not have left work had Burcica not come to her place of employment. Consequently, proximate cause existed, based on the trial court's unchallenged

finding. Accordingly, the assigned error is without merit, and I therefore concur with the majority's ultimate determination as to this issue

### III. Conclusion

**{¶101}** For all the forgoing reasons, I ultimately concur in the majority's determination as to all the issues, except IIED. I would reverse the trial court's award of damages to Ludy for IIED.

**{¶102}** Additionally, because I would reverse the trial court's judgment awarding damages to Ludy for IIED, I would also reverse the trial court's award of punitive damages and remand the matter of punitive damages for the trial court to reconsider its award under R.C. 2315.21(D)(2)(a).

Please note:

The court has recorded its entry on the date of the release of this opinion.